UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION


INGRID BUQUER, BERLIN URTIZ, and    )
LOUISA ADAIR, on their own behalf and    )
on behalf of those similarly situated,    )
                                          )
                    Plaintiffs,           )
                                          )
            vs.                           )            1:11-cv-708-SEB-MJD
                                          )
CITY OF INDIANAPOLIS, et al.,            )
                                          )
                    Defendants.           )


**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION**

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction

[Docket No. 14], filed on May 26, 2011, pursuant to Federal Rule of Civil Procedure 65

in the above-captioned cause.  Plaintiffs seek to have enjoined without bond two

provisions of the recently enacted Senate Enrolled Act 590, scheduled to go into effect on

July 1, 2011.  Specifically, the two portions of that law which Plaintiffs challenge are:

Section 19 of SEA 590, which amends Indiana Code § 35-33-1-1(1), by adding new

sections (a)(11)-(a)(13), authorizing state and local law enforcement officers to make a

warrantless arrest of a person when the officer has a removal order issued for the person

by an immigration court, a detainer or notice of action issued for the person by the United

States Department of Homeland Security, or has probable cause to believe the person has

been indicted for or convicted of one or more aggravated felonies.  Plaintiffs also

challenge Section 18 of SEA 590, to be codified as Indiana Code § 34-28-8.2, which creates a new infraction under Indiana law for any person (other than a police officer) who knowingly or intentionally offers or accepts a consular identification card as a valid form of identification for any purpose.

The legislation under review here, as adopted by the Indiana General Assembly, mirrors a spate of similar laws recently enacted (and challenged in their respective courts) by the states of Alabama, Georgia, South Carolina, Utah and Arizona.  Regarding each of these statutes, the ostensible underlying purpose is the same: all represent attempts by the states to offset in various ways difficulties that have arisen within their jurisdictions from the perceived failures of the federal government to deal more effectively with the broad problem of illegal immigration.  In their attempts to fashion laws to advance this purpose, these states have tended to impose a variety of restrictions on immigrants – some in this country legally, some not – and on businesses who would hire them or conduct other commercial affairs with such persons located or otherwise living within their borders. Tacitly acknowledging that immigration matters are primarily committed to the federal government to regulate, the states' enactments reflect what in some instances appear to be tortuous attempts to carve out legally permissible roles that do not run afoul of federal jurisdictional and constitutional requirements as well as the principles of federal preemption.  Unfortunately, insofar as Indiana's efforts to carve out such a permissible role, at least with regard to the two sections of the statute under review here, their results have proven to be seriously flawed and generally unsuccessful.

Plaintiffs' Complaint challenges the constitutionality of these two sections of SEA 590. Their accompanying Motion for Preliminary Injunction seeks to have the Court enjoin the State of Indiana from enforcing them until a final determination can be made by the Court both as to their constitutionality, arguing that the challenged sections are not only unconstitutional under the Fourth Amendment and due process provisions, and because they run afoul of federal presumption principles as attempts to regulate immigration, an exclusively federal concern. Oral arguments were heard on June 20, 2011. Having considered the parties' briefing and oral arguments, the undisputed documentary evidence, and the controlling principles of law, the Court now <u>GRANTS</u> Plaintiffs' motion for injunctive relief.

## <u>Factual Background</u>

## I.     Federal Immigration Regulation

In 1952, Congress enacted the Immigration and Nationality Act ("INA"), 66 Stat. 163, as amended, 8 U.S.C. § 1101 *et seq*. "That statute established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." <u>Chamber of Commerce of U.S. v. Whiting</u>, 131 S.Ct. 1968, 1973 (2011) (quoting <u>De Canas v. Bica</u>, 424 U.S. 351, 353, 359 (1976)). The INA empowers the Department of Homeland Security ("DHS"), the Department of Justice ("DOJ"), and the Department of State, among other federal agencies, to administer and enforce immigration law. Within DHS, various sub-agencies, including the United States

Immigration and Customs Enforcement ("ICE"), the United States Customs and Border Protection ("CBP"), and the United States Citizenship and Immigration Services ("USCIS"), are involved in this task.

In certain limited situations, federal law permits the delegation of authority to enforce civil immigration law to state and local law enforcement. For example, DHS is permitted to enter into written agreements (known as "287(g) agreements") with states or any political subdivision of a state to allow appropriately trained and supervised officers or employees of the state or subdivision to perform certain immigration responsibilities. 8 U.S.C. § 1357(g)(1). It is undisputed that Indiana has no such agreement with the federal government.

## II.     Section 19

Section 19 of the Act amends Indiana Code § 35-33-1-1(1), by adding new sections (a)(11)-(a)(13), which provide as follows:

> (a) A law enforcement officer may arrest a person when the officer has:
>
> ***
>
> (11)   a removal order issued for the person by an immigration court;
>
> (12)   a detainer or notice of action for the person issued by the United States Department of Homeland Security; or
>
> (13)   probable cause to believe that the person has been indicted for or convicted of one (1) or more aggravated felonies (as defined in 8 U.S.C. 1101(a)(43)).

An understanding of the material phrases incorporated in this statute is necessary; that discussion ensues:

## A.    Removal Order

The INA contains provisions which, *inter alia*, set forth the conditions under which a foreign national may be admitted to and remain in the United States, establish civil penalties and criminal sanctions for immigration violations, and grant DHS the discretion to place non-citizens into removal proceedings for various actions.  See, e.g., 8 U.S.C. §§ 1181-1182, 1184, 1225, 1227-1229, 1306, 1324-25.  Unlawful presence in the United States on its own is not a federal crime, although it can lead to the civil remedy of removal.  8 U.S.C. §§ 1182(a)(6)(A)(I), 1227(a)(1)(B), (C).  Removal proceedings take place within an administrative immigration court system within the DOJ.  8 C.F.R. § 1003.0, *et seq.*

If the Attorney General of the United States issues a warrant after removal proceedings have been initiated against an individual under federal law, that person may be arrested and detained pending a final removal decision.  8 U.S.C. § 1226(a).  However, removal does not occur in every case. After removal proceedings are initiated, the non-citizen may still be released during the pendency of removal proceedings, or even after the removal order has been issued by an immigration judge.  Under 8 U.S.C. § 1226(a), the individual may be released on bond or conditional parole, or, in some cases, be provided with work authorization.  Id. § 1226(a)(3). After a removal order is issued by an immigration judge, the non-citizen has the right to seek reconsideration as well as administrative and judicial review of that determination and may be released on bond until a final determination is made.  8 U.S.C. § 1229a(c)(5).  Even after issuance of a final

removal order, the individual may, in some circumstances, move to reopen the removal proceedings, which may stay his/her removal pending final disposition of the motion. Id. § 1229a(c)(7). If the Attorney General fails to remove the non-citizen within ninety days after the removal order becomes final, the individual is released from detention, subject to supervision by the Attorney General. 8 U.S.C. § 1231(a)(3). Finally, in lieu of deportation, the Attorney General may allow an alien to voluntarily depart the United States during a predetermined period of time. 8 U.S.C. § 1229c.

**B.     Detainer**

If federal or local law enforcement informs ICE that an alien is in custody on non-immigration related charges, ICE may issue a detainer requesting that the law enforcement agency hold the individual for up to 48 hours (not including weekend days and holidays) beyond the time that the detainee would otherwise be released in order to allow ICE to assume custody, if it chooses to do so. 8 C.F.R. § 287.7(d). A detainer is not a criminal warrant, but rather a voluntary request that the law enforcement agency "advise [DHS], prior to release of the alien, in order for [DHS] to arrange to assume custody." Id. § 287.7(a). The detainer automatically expires at the end of the 48-hour period. Id.

**C.     Notice of Action**

The standard form that federal immigration authorities utilize to inform individuals with pending petitions of any sort before the agency of the status of their cases is known as the Notice of Action Form, Form I-797. This form may be used to notify a person of a

wide variety of administrative actions, including that a petition or application with the agency has been received, that a decision has been made on a petition or application, and may even be used to notify an individual that he or she has been granted lawful status. Because an I-797 form is essentially simply a communication between the agency and the petitioner issued for a wide range of administrative reasons, receipt of a notice of action is not a reliable indicator of an individual's immigration status, or whether an individual has engaged in illegal activity, or the circumstances surrounding the individual's presence in the United States.

### D. Aggravated Felonies

The INA provides that an alien convicted of an "aggravated felony" is subject to removal and may not receive asylum in the United States, become a citizen, lawfully reenter the United States, or have removal orders cancelled by the Attorney General.  8 U.S.C. §§ 1158(b)(2)(A)(ii), (b)(2)(B)(I); 1227 (a)(2)(A)(iii); 1229b(a)(3).  However, it is often unclear whether a particular crime constitutes an aggravated felony under federal immigration law.  "Aggravated felony" is defined under 8 U.S.C. § 1101(a)(43), which encompasses 21 subsections, many of which themselves contain multiple crimes.  Thus, determining whether a particular crime meets the definition is a complex analytical undertaking, one with which many courts routinely grapple as have Executive Branch agencies and departments charged with enforcing this law.

## III. Section 18

Section 18 of the Act, to be codified as Indiana Code § 34-28-8.2, provides:

Chapter 8.2.  Offenses Related to Consular Identification

Sec. 1.  As used in this chapter, "consular identification" means an identification, other than a passport, issued by the government of a foreign state for the purpose of providing consular services in the United States to a national of the foreign state.

Sec. 2.  (a) This section does not apply to a law enforcement officer who is presented with a consular identification during the investigation of a crime.

(b) Except as otherwise provided under federal law, a person who knowingly or intentionally offers, accepts, or records a consular identification as a valid form of identification for any purpose commits a Class C infraction.  However, the person commits:
(1) a Class B infraction for a second offense; and
(2) a Class A infraction for a third or subsequent offense.

**Consular Identification Documents ("CIDs"):**

The Vienna Convention on Consular Relations ("VCCR"), to which the United States is a signatory, provides, *inter alia*, that a foreign consulate may issue travel documents, visas, or other appropriate documents to protect and assist its citizens in the foreign country.  Vienna Convention on Consular Relations and Optional Protocol on Disputes, Art. 5(a), (d), (e), T.I.A.S. No. 6820, 21 U.S.T. 77, 1969 WL 97928 (Dec. 14, 1969).  Consular identification documents ("CIDs") are photo identification cards issued by many embassies and consulates, including the United States, "to encourage their citizens abroad to register with the consulates so that they can receive standard consular services, be notified if necessary, and be located upon inquiry by relatives and authorities."  Congressional Research Service, <u>Consular Identification Cards: Domestic and Foreign Policy Implications, the Mexican Case, and Related Legislation</u> at CRS-1

(2005), <u>available at</u> http://www.fas.org/sgp/crs/misc/RL32094.pdf.  The Court has been informed that the issuance of these identification documents is a matter which the respective foreign governments closely supervise and tightly manage.

Under the VCCR, a foreign national arrested or detained in the United States must be advised of his or her right to request that appropriate consular officials be timely notified of the individual's detention.  Thus, individuals can use CIDs to alert federal, state, and local law enforcement authorities of the need to notify consular officials when assistance is required.  Cardholders also commonly use CIDs for identification purposes, such as with financial institutions, law enforcement agencies, and state and local governments in the United States, as well as for other transactions that require photo identification, including cashing checks, renting housing, or enrolling children in school, especially when no other forms of photo identification are available to them for their use.

The parties stipulate that limitations or restrictions on the use of these documents in connection with official state matters is a permissible exercise of state governmental authority.  As for the non-state governmental uses, however, the parties here disagree as to their lawfulness.

## IV.   Background on the Named Plaintiffs

Ingrid Buquer is a Mexican citizen who resides in Johnson County (Indiana) and also spends a significant amount of time in Marion County.  She has applied for a U-Visa as a victim of, or a witness to, a violent crime, which, if granted, will allow her to remain in the United States.  <u>See</u> 8 U.S.C. § 1101(a)(15)(U).  She has received an I-797 Notice of

Action to inform her of the pendency of her U-Visa application. Ms. Buquer has also received a CID from the Mexican Consulate in Indianapolis, which she uses in both Johnson and Marion Counties for many purposes, such as banking and shopping as well as in other situations in which identification is required. She has at times presented her CID when receiving services at the Mexican Consulate as proof of her Mexican citizenship. Ms. Buquer testified by affidavit that she is unable to obtain an identification card or license from the State of Indiana. Buquer Aff. ¶ 8. Plaintiffs contend that, because Ms. Buquer has received a Notice of Action, she will be subject to warrantless arrest pursuant to Section 19 when and if the law goes into effect on July 1, 2011. Additionally, under Section 18, effective July 1, 2011, she will not be able to use her CID for identification without being subject to a civil infraction.

Louisa Adair is a citizen of Nigeria who currently resides in Marion County. Ms. Adair had a removal order issued against her in 1996, but she is currently released by ICE on an Order of Supervision, under which she reports to ICE every six months. She has been issued a valid work authorization document from DHS and she receives a I-797 Notice of Action each time she applies to renew her employment authorization card. Ms. Adair has filed a Motion to Reopen and Terminate Removal Proceedings and has also made a formal request that the ICE Chief Counsel's office exercise its prosecutorial discretion and join in her in that motion. If her request is granted, she will be eligible to apply for lawful permanent residency because her mother is a citizen of the United States and Ms. Adair possesses an approved and current I-130 visa petition. Ms. Adair also

received an I-797 Notice of Action approving the I-130 petition that establishes her relationship to her citizen-mother. Plaintiffs contend that, because Ms. Adair has received both a removal order and various Notice of Action forms, she will be subject to warrantless arrest by Indiana law enforcement officers when and if Section 19 goes into effect on July 1, 2011.

Berlin Urtiz is a citizen of Mexico who currently resides in Marion County. He has been a lawful permanent resident of the United States since 2001. In 2004, Mr. Urtiz was convicted of theft in Johnson County and sentenced to two years in prison, which was subsequently suspended to probation. This crime was initially determined to be an aggravated felony under 8 U.S.C. § 1101(a)(43), and, in 2010, he was taken into custody by ICE and detained for four months pending removal. However, in September 2010, he was granted post-conviction relief. His theft conviction was vacated in November 2010 and he was re-sentenced for the misdemeanor offense of conversion, which does not qualify as an aggravated felony. Currently, there are no removal proceedings pending against Mr. Urtiz and he remains a lawful permanent resident, but Plaintiffs contend that, inasmuch as he has been convicted of an aggravated felony in the past, he will be subject to warrantless arrest by Indiana law enforcement officers on this basis when and if Section 19 goes into effect on July 1, 2011.

## Legal Analysis

## I. Standard of Review

The grant of injunctive relief is appropriate if the moving party is able to

demonstrate: (1) a reasonable likelihood of succeeding on the merits; (2) irreparable harm if preliminary relief is denied; and (3) an inadequate remedy at law. <u>Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.</u>, 549 F.3d 1079, 1086 (7th Cir. 2008). If the moving party fails to demonstrate any one of these three threshold requirements, the emergency relief must be denied. <u>Id.</u> However, if these threshold conditions are met, the Court must then assess the balance of harm – the harm to Plaintiffs if the injunction is not issued against the harm to Defendant if it is issued – and, where appropriate, also determine what effect the granting or denying of the injunction would have on nonparties (the public interest). <u>Id.</u>

In determining whether to grant injunctive relief, the district court must take into account all four of these factors and then "exercise its discretion 'to arrive at a decision based on the subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." <u>Id.</u> (quoting <u>Lawson Products, Inc. v. Avnet, Inc.</u>, 782 F.2d 1429, 1436 (7th Cir. 1986)). This process involves engaging in what is called the "sliding scale" approach, meaning that "the more likely it is the plaintiff will succeed on the merits, the less balance of irreparable harms need weigh toward its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." <u>Abbott Laboratories v. Mead Johnson & Co.</u>, 971 F.2d 6, 12 (7th Cir. 1992) (citations omitted). The sliding scale approach "is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" <u>Ty, Inc. v. Jones</u>

12

Group, Inc., 237 F.3d 891, 895-96 (7th Cir. 2001) (quoting Abbott Laboratories, 971 F.2d at 12).

## II.    Likelihood of Success on the Merits

### A.    Section 19

#### 1.    Standing

Defendants initially contend that all three named Plaintiffs lack standing to sue, having failed to show that they are under threat of suffering any injury because they have failed to establish with certainty that they will be subject to arrest under Section 19 when and if it becomes effective.  To have standing to seek injunctive relief, "a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury."  Summers v. Earth Island Institute, 555 U.S. 488, 129 S.Ct. 1142, 1149 (2009) (citing Friends of Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)).

**Mr. Urtiz:** Defendants argue that Mr. Urtiz lacks standing to challenge the constitutionality of Section 19 because he has neither been indicted for nor convicted of an aggravated felony as Plaintiffs allege.[1]  Specifically, Defendants contend that, because

---

[1] As laid out above, pursuant to Indiana Code § 35-33-1(a)(13), a law enforcement officer may arrest a person when the officer has "probable cause to believe that the person has been indicted for or convicted of one (1) or more aggravated felonies (as defined in 8 U.S.C. §

(continued...)

all but two days of Mr. Urtiz's court-ordered two-year sentence in the Indiana Department of Correction was suspended to probation, he fails to meet the one-year minimum term of imprisonment required for a theft offense to constitute an aggravated felony under 8 U.S.C. § 1101(a)(43). However, the applicable federal statute defines "term of imprisonment" to include "the period of incarceration or confinement ordered by a court of law *regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part*." 8 U.S.C. § 1101(48)(B) (emphasis added). This definition applies regardless of whether the conviction was entered before, on, or after September 30, 1996, the effective date of the INA. 8 U.S.C. § 1101(a)(43). Thus, Mr. Urtiz's two-year sentence exceeds the one-year threshold required for a theft conviction to constitute an aggravated felony, notwithstanding the fact that nearly the entire sentence was suspended to probation.

Defendants also argue that Mr. Urtiz does not fall within the terms of Section 19's proscriptions for the additional reason that his conviction for an aggravated felony was subsequently vacated and reduced to a misdemeanor. However, Section 19 specifically authorizes the arrest of anyone for whom an officer has probable cause to believe "*has been* ... convicted of one (1) or more aggravated felonies." IND. CODE § 35-33-1-1(a)(13) (emphasis added). As Plaintiffs note, the use of the past participle in the statute implies that this provision applies as long as the individual was convicted at any time in the past.

---

[1](...continued)
1101(a)(43))."

Section 19 makes no distinctions as to convictions that are later overturned or expunged. Clearly, whenever the Indiana General Assembly has sought to have the term "conviction" exclude convictions that have been reversed or vacated, it has made that intention clear.  See, e.g., IND. CODE 3-8-1-5(b) (convictions that have been reversed, vacated, or set aside do not qualify for statute disqualifying a person convicted of a felony from assuming or being a candidate for elected office).  For these reasons, we find that Mr. Urtiz will be subject to arrest under § 35-33-1-1(a)(13) when and if Section 19 becomes effective.

**Ms. Adair and Ms. Buquer:** Ms. Adair has received a removal order from immigration.  Defendants argue that Ms. Adair nonetheless lacks standing to challenge Indiana Code § 35-33-1-1(a)(11), which allows an officer to arrest an individual for whom a removal order has been issued by an immigration court, because her removal order was subsequently "superseded" by an Order of Supervision.  Defendants' characterization is in error, however, because, rather than superseding a removal order, an order of supervision is issued "pending removal" and merely imposes conditions on an individual's release in cases where the person neither leaves nor is removed within the statutory period.  See 8 U.S.C. § 1231(a)(3).  Thus, although Ms. Adair has received an order of supervision, there is no evidence that her removal order is no longer current and in-force.  Accordingly, she meets the definition of individuals who are subject to arrest under § 35-33-1-1(a)(11), since she has "a removal order issued for [her] by an immigration court."

Defendants argue that neither Ms. Adair nor Ms. Buquer has standing to challenge Indiana Code § 35-33-1-1(a)(12) because the notices of action that they each received are "benign" and further, the Court must assume that Section 19 would only be enforced against those with "non-benign" notices of action.[2] However, § 35-33-1-1(a)(12) permits the arrest of any person who has a "notice of action ... issued by the United States Department of Homeland Security," making no distinction between benign and non-benign notices nor does the statute (or Defendants for that matter) indicate what constitutes a non-benign notice of action. It is undisputed that both Ms. Adair and Ms. Buquer possess notices of action issued by DHS and nothing in the plain language of the statute excludes their notices of action from inclusion within the terms of Section 19. Thus, we find that both Ms. Adair and Ms. Buquer will be subject to arrest when and if Section 19 becomes effective on July 1, 2011 sufficient to satisfy the requirements of standing.

It is true that none of the Plaintiffs has yet suffered a direct injury based on Section 19 because, obviously, the statute is not yet in effect. However, it is well established that "the existence of a statute implies a threat to prosecute [and thus] pre-enforcement challenges are proper, because a probability of future injury counts as 'injury' for the purpose of standing." Bauer v. Shepard, 620 F.3d 704, 708 (7th Cir. 2010) (citations omitted). Interestingly, Defendants have argued that the authorizations given police

---

[2] The terms "benign" and "non-benign" do not appear in the statute; their use here reflects the adversarial effort by defense counsel to salvage their standing arguments.

officers to effect arrests of persons under these provisions may never be enforced, suggesting that Plaintiffs are thus not at risk or otherwise injured until such time as they are actually arrested. We reasonably assume that the Indiana General Assembly intended this law to be enforced in accordance with its authorizations when it was enacted. Accordingly, because Plaintiffs have established that they fall within the definition of those individuals who will be subject to arrest if and when Section 19 becomes effective on July 1, 2011, their standing to bring this action seeking injunctive relief has been established.

### 2.     Ripeness

In related fashion, Defendants maintain that Plaintiffs' challenge to Section 19 is not ripe for adjudication. Defendants argue that Plaintiffs are unable to point to a specific threat of the application of the Act, and, because the nature and scope of its application have not yet been developed, any determination by the Court regarding its constitutionality would be premature.

To determine whether a case is ripe for adjudication, a court must determine "first, whether the relevant issues are sufficiently focused so as to permit judicial resolution without further factual development; and second, whether the parties would suffer any hardship by the postponement of judicial action." <u>Triple G Landfills, Inc. v. Bd. of Comm'rs of Fountain County, Ind.</u>, 977 F.2d 287, 289 (7th Cir. 1992) (citations omitted). The first factor is generally met where "[t]he issues posed are purely legal ... and would not be clarified by administrative proceedings or any other type of factual development."

Id.  The parties here agree that, at least at the preliminary injunction stage, the Fourth

Amendment and preemption issues presented to the Court are purely legal rather than

factual issues.  Accordingly, this first factor is met.

Plaintiffs argue that the second factor is also met because, absent judicial action,

they face the threat of arrest when and if Section 19 becomes effective on July 1, 2011.

Defendants rejoin that, because the scope and application of Section 19 has not yet been

developed, Plaintiffs' assertion that they will be subject to arrest is nothing more than

speculation based on the assumption that a non-party (a state or local law enforcement

officer) will perform a wholly discretionary act, to wit, the arrest of one of the Plaintiffs,

based solely on the authority granted by Section 19.

Courts have long upheld pre-enforcement challenges to various civil and criminal

statutes despite the fact that the discretionary authority of government officials is present

in virtually all such statutes, and it is well-established that a plaintiff need not be required

to undergo arrest and prosecution before being able to challenge the constitutionality of a

statute.  See, e.g., Babbit v. UFW Nat'l Union, 442 U.S. 289, 298 (1979) ("[O]ne does not

have to await the consummation of a threatened injury to obtain preventive relief.")

(citation and quotation omitted); Steffel v. Thompson, 415 U.S. 452, 459 (1974) ("[I]t is

not necessary that petitioner first expose himself to actual arrest or prosecution to be

entitled to challenge a statute that he claims deters the exercise of his constitutional

rights."); Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n, 149 F.3d

679, 687 (7th Cir. 1998) ("It is not necessary ... that a plaintiff expose itself to actual

arrest or prosecution.").

As long as there is a credible threat of enforcement, the second prong of the ripeness doctrine is satisfied. Such a threat is credible "when a plaintiff's intended conduct runs afoul of a criminal statute and the Government fails to indicate affirmatively that it will *not* enforce the statute." Commodity Trend Serv., 149 F.3d at 687 (citing Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 393 (1988) (emphasis in original)). Here, for the reasons deemed applicable to resolving the standing issue, Plaintiffs have shown that they fall within the ambit of those who will be subject to arrest under Section 19. Moreover, neither party has pointed to evidence to establish, nor is there anything in the statute or legislative history to suggest, that Section 19 will not be enforced as written.

This case is distinguishable from the circumstances presented in Indiana Right to Life, Inc. v. Shepard, 507 F.3d 545 (7th Cir. 2007), where the Seventh Circuit held that the issues presented were not ripe for adjudication because there was no evidence of a real threat of enforcement of the challenged provisions. In that case, the plaintiffs were able to point to evidence that the provisions at issue had never been enforced in the ten years of their existence. No similar evidence has been presented here to show that Section 19, having now been enacted, will not be enforced. Given the concerns and purposes underlying this statute and informing the decision of the Indiana General Assembly to enact this law and in light of the heightened political rhetoric accompanying public debates on issues of immigration policy across Indiana and elsewhere, it is

reasonable to assume that, armed with these new and expanded powers, state law

enforcement officials will undertake to enforce them.  Accordingly, we find that Plaintiffs

have alleged an actual and credible fear that Section 19 will be enforced against them,

should the statute become effective on July 1, 2011.  For these reasons, we hold that

Plaintiffs' challenge is ripe for adjudication.

### 3.      Fourth Amendment and Due Process Issues

Section 19 authorizes state and local law enforcement officers to effect warrantless

arrests for matters that are not crimes.  Defendants concede that nothing under Indiana

law makes criminal the receipt of a removal order, a notice of action or detainer, or a

person's having been indicted for or convicted of an aggravated felony.  Defs.' Resp. at

12.  Defendants also concede that arrests based solely on Section 19 "could potentially be

in violation of the Fourth Amendment."  Id. at 3.  Nevertheless, Defendants argue that,

because Plaintiffs have raised a facial challenge to the statute, the Court must presume

that government officials will apply Section 19 in a constitutional manner.

"[A]n arrest is reasonable under the Fourth Amendment so long as there is

probable cause to believe that *some* criminal offense has been or is being committed."

Fox v. Hayes, 600 F.3d 819, 837 (7th Cir. 2010) (emphasis in original) (citations

omitted).  It is true that, "'[i]n evaluating a facial challenge to a state law, a federal court

must ... consider any limiting construction that a state court or enforcement agency has

proffered.'"  Ward v. Rock Against Racism, 491 U.S. 781, 795-96 (1989) (quoting

Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494 n.5 (1982)).

However, "a federal court may not slice and dice a state law to 'save' it; we must apply the Constitution to the law the state enacted and not attribute to the state a law we could have written to avoid the problem." K-S Pharmacies, Inc. v. American Home Products, Corp., 962 F.2d 728, 730 (7th Cir. 1992) (citations omitted). Here, Defendants maintain that the Court is obligated to presume that the arrest provisions set forth in Section 19 would be applied constitutionally, that is, in accordance with the Fourth Amendment and due process requirements, and thus that these expanded arrest powers would be utilized only in conjunction with an otherwise lawful arrest.

We find this interpretation entirely fanciful, however, given that it completely ignores the plain language of the statute. Section 19 expressly provides that state and local enforcement officers "may arrest" individuals for conduct that all parties stipulate and agree is not criminal. The statute contains no reference to Fourth Amendment protections nor does it include a requirement that the arrest powers granted to law enforcement officers under Section 19 be used only in circumstances in which the officer has a separate, lawful reason for the arrest. Moreover, accepting Defendants' proposed construction would, in effect, read the statute out of existence. Apart from the exclusion of Fourth Amendment requirements regarding probable cause to arrest, Section 19 bestows no authority on law enforcement officers beyond the power to arrest for the non-criminal conduct enumerated therein, leaving a deafening silence as to what happens to the arrestee post his arrest. There is no mention of any requirement that the arrested person be brought forthwith before a judge for consideration of detention or release.

There is in fact a complete void within the new statute regarding all other due process protections. Our acceptance of Defendants' theory, based on their seemingly desperate effort to save it, would be to require the Court to construe it contrary to its plain language, which clearly authorizes law enforcement officials to arrest an individual without regard to whether that individual was already subject to a lawful arrest. Such an interpretation, apart from being based on nothing within the text of the statute itself, would render Section 19 completely meaningless. We cannot and shall not interpret a statute in such an unprincipled fashion. United States v. Berkos, 543 F.3d 392, 396 (7th Cir. 2008).

In short, if the Court were to accept Defendants' proposed construction of the arrest powers provision, it would entail a radical rewriting of Section 19, which the Court is not empowered to do. Even if such broad interpretive powers were possible, the construction Defendants have proposed would be entirely untenable because, as we have noted above, it would render the challenged statute meaningless. Accordingly, we find that Plaintiffs have established that they are likely to succeed on the merits of their claim that Section 19 is susceptible to only one interpretation, to wit, that it authorizes the warrantless arrest of persons for matters and conduct that are not crimes. Because such power contravenes the Fourth Amendment, Section 19 would be unconstitutional.[3]

---

[3] Defendants make a passing argument that it is as yet undetermined whether the Fourth Amendment even applies to undocumented aliens. However, we read the caselaw to say otherwise. Following the Supreme Court's decision in Immigration and Naturalization Service v. Lopez-Menoza, 468 U.S. 1032 (1984), in which the Court accepted the principle that the Fourth Amendment does apply to undocumented individuals, courts, including the Seventh Circuit, routinely apply the Fourth Amendment in cases involving undocumented aliens. See,

(continued...)

### 4. Preemption

Plaintiffs are also likely to succeed in establishing that Section 19 is preempted by federal law. By virtue of the Supremacy Clause, it is "[a] fundamental principle of the Constitution ... that Congress has the power to preempt state law." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000) (citations omitted). Preemption, express or implied, "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977) (citations omitted). In cases in which Congress has not explicitly provided for preemption in a given statute, state law must still yield in two circumstances. First, "[w]hen Congress intends federal law to 'occupy the field,' state law in that area is preempted." Crosby, 530 U.S. at 372. Even if Congress has not occupied the field, state law is preempted as well where it conflicts with federal law. Conflicts arise when "compliance with both federal and state regulations is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982) (internal quotations and citations omitted). To determine whether "obstacle" preemption exists, a court must employ its "judgment, to be informed by examining the federal statute as a whole and identifying its purpose and

---

[3](...continued)
e.g., United States v. Quintana, 623 F.3d 1237, 1239 (8th Cir. 2010); United States v. Villegas, 495 F.3d 761 (7th Cir. 2007).

intended effects."  Crosby, 530 U.S. at 373.

Defendants argue that Section 19 is not preempted because it does not constitute a

regulation of immigration or a usurpation of federal authority, but merely "provides

guidance to law enforcement officers as to when they 'may' arrest," giving "Indiana

officers the discretion to assist federal enforcement of immigration laws."  Defs.' Resp. at

15.  However, Defendants have failed to point to any authority allowing states to *sua*

*sponte* assist the federal government in enforcing immigration laws nor is there evidence

that Indiana has entered into a 287(g) agreement with the federal government that might

allow it to render such assistance.  Moreover, the guidance the statute provides authorizes

state and local law enforcement to arrest in circumstances far broader than those in which

Congress has allowed state and local officers to arrest immigrants, (8 U.S.C. § 1252c),[4]

and, in fact, authorizes a much broader warrantless arrest power than even federal officers

---

[4] Pursuant to 8 U.S.C. § 1252c, state and local officers are given the authority, "to the extent permitted by relevant State and local law," to arrest and detain an individual who:

(1) is an alien illegally present in the United States; and

(2) has previously been convicted of a felony in the United States and deported or left the United States after such conviction,

but only after the State or local law enforcement officials obtain appropriate confirmation from the Immigration and Naturalization Service of the status of such individual and only for such period of time as may be required for the Service to take the individual into Federal custody for purposes of deporting or removing the alien from the United States.

are given under federal law. 8 U.S.C. § 1357(a)(2).[5] We are not aware of nor has either

party pointed to an INA provision indicating that Congress intended state and local law

enforcement officers to retain greater authority to effectuate a warrantless arrest than

federal immigration officials.

It is true that state laws addressing legitimate local interests that only indirectly

touch on immigration matters are not preempted. See DeCanas, 424 U.S. at 355-57

(superseded by statute on other grounds). Here, however, Defendants have failed to

identify a specific state or local interest that is addressed by allowing the warrantless

arrest (without any instructions as to what is to happen with the arrestee thereafter) of any

individual who has received a detainer order, a notice of action, or a removal order from

the federal government or who has ever been indicted for or convicted of an aggravated

felony, none of which necessarily indicates that the individual is subject to federal

detention. Far from having an indirect impact on immigration, it is reasonable to predict

that many such arrests authorized under Section 19 will be in direct contravention of "the

carefully calibrated scheme of immigration enforcement that Congress has adopted."

---

[5] Under 8 U.S.C. § 1357(a)(2), federal officers are authorized to arrest without a warrant
any alien:

> who in his presence or view is entering or attempting to enter the United States in
> violation of any law or regulation made in pursuance of law regulating the
> admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the
> United States, if he has reason to believe that the alien so arrested is in the United
> States in violation of any such law or regulation and is likely to escape before a
> warrant can be obtained for his arrest, but the alien arrested shall be taken without
> unnecessary delay for examination before an officer of the Service having
> authority to examine aliens as to their right to enter or remain in the United States.

United States v. Arizona, ___ F.3d ___, 2011 WL 1346945, at *17 (9th Cir. Apr. 11, 2011).

For example, Section 19 authorizes arrest for any individual in receipt of a removal order.  However, having a prior removal order is not proof that the person is subject to detention by federal authorities.  In Ms. Adair's situation, although she has a removal order issued by the federal government, with the permission of federal authorities she has been permitted to remain free from custody and to obtain work authorization.  In such circumstances where the federal government has exercised its discretion to release an individual like Ms. Adair, who has had a removal order issued, the subsequent arrest of that person by Indiana law enforcement officers directly conflicts with the federal decision, obviously and seriously interfering with the federal government's authority in the field of immigration enforcement.

The conflict is even more apparent with regard to Section 19's authorization for arrest of individuals who have been issued a notice of action.  Notices of action are inherently non-criminal and receipt of such a form generally merely acknowledges that the individual's information dealing with immigration matters has been received by INS or that an immigration decision has been made.  Such communications could be as innocuous as informing the recipient that a visa application has been received and is being processed or even that he or she has attained lawful alien status.  Although Defendants argue that it should be presumed that state and local law enforcement officers would utilize their arrest powers only in cases where the notice of action received is

"substantive" or "non-benign," no such limitation appears in Section 19 nor are those terms defined, leaving to anyone's guess what would constitute a "non-benign" or "substantive" notice of action or how any Indiana law enforcement officer could be expected to know the basis for such a distinction.  Clearly, it is not the intent or purpose of federal immigration policy to arrest individuals merely because they have at some point had contact with an administrative agency about an immigration matter and received notice to that effect.  Authorizing an arrest for nothing more than the receipt of an administrative notification plainly interferes with the federal government's purpose of keeping those involved in immigration matters apprised of the status of their cases, *but not arresting* them.

Federal law specifies that the immigration penalties associated with aggravated felonies arise only if the individual has been *convicted* of the offense.  8 U.S.C. § 1101(a)(43).  Yet Section 19 allows state and local law enforcement to arrest those who they have probable cause to believe have merely been *indicted* for such an offense.  Considering that the determination of whether a crime constitutes an aggravated felony is often such a complex and confusing undertaking, and that there is no guidance in Section 19 as to how a state or local officer should make that determination, the power to arrest on that basis threatens serious abuses.  Regardless, authorizing the arrest of individuals who have been indicted but not yet convicted of an aggravated felony runs counter to the federal intent to limit such penalties.  Even in cases where there has been a conviction covered under Section 19, if the federal government fully resolves the issue of the alien's

27

conviction and determines that no penalty will be imposed, a subsequent arrest by state authorities directly conflicts with the federal determination.  That is the harm posed Mr. Urtiz.

Federal immigration law consists of a myriad of provisions together creating a balance between competing regulatory and policy objectives.  In order to maintain that balance throughout the country, federal law vests discretion at the federal level regarding whether and which persons without full, lawful alien status should be arrested.  However, Section 19 alters that balance by authorizing the arrest for immigration matters of individuals within the State of Indiana only whom, in many cases, the federal government does not intend to be detained.  As such, Section 19 interferes with federal discretion relating to priorities for immigration enforcement and the best methods for carrying out those enforcement responsibilities.  For these reasons, we find that Plaintiffs have established a likelihood of ultimately prevailing on the merits of their claim that Section 19 is preempted by federal law.

**B.**  **Section 18**

**1.**  **Standing**

Defendants contend that Ms. Buquer does not have standing to challenge the constitutionality of Section 18 because there is no evidence that she is unable to obtain a valid identification card from the State of Indiana or that, in fact, she has even attempted to do so, thereby failing to establish that she will be subject to Indiana Code § 34-28-8.2.  However, Ms. Buquer testified by affidavit that she is unable to obtain an identification

card or a driver's license from the State of Indiana because she does not possess any of the requisite documents for doing so. Buquer Aff. ¶ 8; Buquer Supp. Aff. ¶ 2. Thus, Ms. Buquer has presented sufficient evidence to show that she will be subject to Section 18, if and when it goes into effect on July 1, 2011, which is sufficient to confer standing on her claim.

### 2. Preemption

Plaintiffs argue that Section 18 interferes with rights bestowed on foreign nations by treaty as well as with the federal government's responsibilities for the conduct of foreign relations, and is thus preempted. Defendants rejoin that the statute does not directly conflict with any treaty nor does it impede the federal government's ability to manage foreign affairs, because Section 18 is merely an internal regulation outlining acceptable forms of identification within the State of Indiana that does not single out or conflict with any identifiable immigration policy or regulation.

Issuing CIDs is one of the prerogatives of a foreign government that is protected by the Vienna Convention of Consular Relations ("VCCR"), to which the United States is a signatory. Defendants maintain that Section 18 does not conflict with the VCCR because it does not prevent a consulate from issuing a CID or from accepting a CID at the consulate itself. It is true that Section 18 does not prohibit a foreign government from issuing CIDs to its citizens, and thus does not directly conflict with the VCCR. However, while Section 18 does not prohibit a consulate from issuing CIDs, it in essence makes their issuance meaningless as it prohibits almost every use for which the documents are

ordinarily issued, including for identification purposes in private commercial transactions

that are conducted between private parties.  In light of this drastic limitation imposed by

Section 18, we are unable to dismiss the statute's impact as inconsequential.  Rather, it

appears that the statute directly interferes with rights bestowed on foreign nations by

treaty.

It is also clear that such a sweeping prohibition has the potential to directly

interfere with executive discretion in the foreign affairs field.  The executive branch's

authority over matters of foreign affairs is an implied constitutional power.  Youngstown

Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610 (1952).  "The exercise of the federal

executive authority means that state law must give way where ... there is evidence of clear

conflict between the policies adopted by the two."  American Ins. Ass'n v. Garamendi,

539 U.S. 396, 421 (2003).  The State Department has in the past cautioned the federal

government against taking action against CIDs that might cause other countries to

similarly restrict the use and acceptance of such documentation for American citizens

abroad.[6]  See Testimony of Acting Deputy Assistant Secretary of State Roberta Jackson

for the Bureau of Western Hemisphere Affairs, Hearing on the Federal Government's

Response to Consular Identification Cards Before the House Subcommittee on

Immigration, Border Security, and Claims, House Committee on the Judiciary, 108th

---

[6] The risk that a state law could result in similar retaliatory actions by foreign governments is no less a concern.  The potential impact that Section 18 has on the United States' relationship and dealings with foreign countries is reflected in the concerns raised by Mexico, Brazil, Guatemala, El Slavador, and Colombia in their *amicus curiae* briefs filed in this action.

Cong. 44-45, at 114 (Jun. 26, 2003).

Additionally, the United States Treasury Department has adopted regulations which, though not requiring financial institutions to accept CIDs and other foreign government-issued documents for identification purposes, allow such entities to do so, and has specifically declined to prohibit financial institutions from relying on particular forms of foreign government-issued identification.  See 31 C.F.R. § 1020.220; 68 Fed. Reg. 55335, 55336 (Sept. 25, 2006).  Thus, while these regulations may not create a direct conflict with Section 18, they are further evidence of the federal government's overarching and legitimate interest in proceeding with caution with regard to regulating the use of CIDs.  The State of Indiana's decision to enact a statute which makes it a civil infraction for *anyone* to use CIDs as valid identification for *any* purpose is incompatible with the federal government's supremacy as well as its deliberately measured approach.

Defendants cite to cases in which courts have found state laws not preempted which deal with matters of traditional state regulation and had only an indirect impact on foreign policy.  See Dunbar v. Seger-Thomshitz, 615 F.3d 574 (5th Cir. 2010) cert. denied, 131 S.Ct. 1511 (2011) (holding that Louisiana prescription period applying generally to any challenge of ownership to movable property was not preempted even though the object of the litigation was Nazi-confiscated artwork); Museum of Fine Arts, Boston v. Seger-Thomshitz, 623 F.3d 1 (1st Cir. 2010) cert. denied, 131 S.Ct. 1612 (2011) reh'g denied, 10-901 2011 WL 1529816 (U.S. Apr. 25. 2011) (holding that statute of limitations on conversion was statute of general regulation that does not conflict with

federal policy).  Defendants maintain that, similar to the statutes of general application directed toward matters of state concern, Section 18 "does not single out any identifiable immigration policy or regulation, but rather outlines acceptable forms of identification within the State of Indiana."  Defs.' Resp. at 21.

The problem with Defendants' argument here is that Section 18 is anything but a neutral law of general application that just happens to have a remote and indirect effect on foreign relations.  Rather, it targets only one form of identification – CIDs issued by foreign governments.  Moreover, Section 18 regulates CIDs in the broadest possible terms, restricting not just what state agencies may accept as valid identification but prohibiting what identification may be shown and accepted for purely private transactions.  "A person," the statute says, and that's all it says.  These sweeping regulations, targeted solely at foreign government-issued identification that consulates are, by treaty, entitled to issue, and which restrict the manner in which foreign citizens may travel, live, and trade in the United States have a direct effect on our nation's interactions with foreign nations.  Such interactions cannot be dictated or restricted by individual states.  For these reasons, we find that, at this preliminary stage, Plaintiffs have established a likelihood of success on the merits of their claim that Section 18 is preempted.

### 3.  Due Process and Equal Protection

Plaintiffs also challenge Section 18 on due process and equal protection grounds, arguing that the statute is arbitrary and bears no rational relation to legitimate government

32

interests. Defendants rejoin that the statute is rationally related to the legitimate government purpose of ensuring the reliability of identification of individuals within the state and preventing fraud against law enforcement, merchants, and consumers.

Under traditional due process and equal protection analysis, state action must be sustained as long as it bears a rational relation to a legitimate governmental interest. R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 406 (1992). Even under this highly deferential standard of review, we find that Plaintiffs have demonstrated a reasonable likelihood of success on the merits of their claim that Section 18 is violative of due process and equal protection principles. Although we do not dispute that the stated purpose of ensuring the reliability of identification of individuals within the state and preventing fraud against the *state* is a legitimate governmental purpose, the breadth of the limitation imposed by Section 18, to wit, preventing *any person* (other than a police officer) from either knowingly presenting or accepting a CID as a valid form of identification *for any purpose* far exceeds its stated purpose and therefore is not rational.

While all parties agree that the State of Indiana has the authority to prohibit the use of various forms of identification, including CIDs, at state agencies, such as the Bureau of Motor Vehicles, Section 18 goes far beyond such regulation to prohibit their use or acceptance in any transaction requiring valid identification, even those between purely private parties who would otherwise be willing to accept CIDs in the context of wholly private transactions. Although Defendants maintain that there has long been a concern regarding the reliability of CIDs, Plaintiffs have presented evidence indicating that they

33

are actually a highly secure form of identification. Upon careful review of the admittedly limited evidence before us given the preliminary stage of this litigation, we are persuaded that CIDs are, at the very least, as reliable as a number of other forms of documentation that individuals are permitted to use for certain identification purposes in Indiana, such as leases, utility bills, and student ID cards. Accordingly, the legislature's decision to single out for punishment individuals using CIDs for identification purposes from all other individuals, many of whom are using other, arguably more unreliable forms of identification simply does not rationally further the goal of the prevention of fraud or otherwise ensure the reliability of identification. Regrettably in our view, the distinction more accurately appears to have been designed simply to target foreign nationals. As the Supreme Court has recognized, "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." United States Dep't of Agriculture v. Moreno, 413 U.S. 528, 534 (1973).

## II.     Irreparable Harm/Inadequate Remedy at Law

Plaintiffs have met their burden on both of these prongs of the preliminary injunction analysis. It is well-established that, "'[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'" Campbell v. Miller, 373 F.3d 834, 840 (7th Cir. 2004) (quoting Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984)). Moreover, "showing irreparable harm is '[p]robably the most common method of demonstrating that there is no adequate

legal remedy.'" Id. (quoting 11A Wright, Miller & Kane, Federal Practice and Procedure § 2944).

## III. Balance of Harms

We have already found that Plaintiffs will suffer irreparable harm if a preliminary injunction does not issue. In contrast, Defendants will suffer minimal, if any, harm by allowing the status quo to be maintained pending a final determination in this matter, since these areas addressed by the new and soon to be enjoined state law will remain under federal controls and authority. Thus, the balance of harms weighs clearly in Plaintiffs' favor.

## IV. Public Interest

Plaintiffs have also established that a preliminary injunction is in the public interest. It is well-established under controlling Seventh Circuit law that "the public has a strong interest in the vindication of an individual's constitutional rights ...." O'Brien v. Town of Caledonia, 748 F.2d 403, 408 (7th Cir. 1984). Additionally, as the Ninth Circuit recently recognized in the closely analogous case, United States v. Arizona, 2011 WL 1346945, at *19, it is clearly not in the public interest "'to allow the state ... to violate the requirements of federal law .... In such circumstances, the interest of preserving the Supremacy Clause is paramount.'" Id. (quoting Cal. Pharmacists Ass'n v. Maxwell-Jolly, 563 F.3d 847, 852-53 (9th Cir. 2009)) (emphasis omitted).

## V. Bond

Rule 65(c) of the Federal Rules of Civil Procedure provides that: "The court may

issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, the Seventh Circuit has recognized that, "[u]nder appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)." Wayne Chem., Inc. v. Columbus Agency Serv. Corp., 567 F.2d 692, 701 (7th Cir. 1977) (citations omitted). We hold that a bond is not required here, as Defendants are not facing any monetary injury as a result of the issuance of the preliminary injunction.

## VI.    Conclusion

For the foregoing reasons, we GRANT Plaintiffs' Motion for Preliminary Injunction. Defendants are hereby PRELIMINARILY ENJOINED from enforcing the following sections of Senate Enrolled Act 590: Section 18, to be codified as Indiana Code § 34-28-8.2, and Section 19, which amends Indiana Code § 35-33-1-1(1), by adding new sections (a)(11)-(a)(13) until further order of this Court. Defendants are hereby further ordered to inform forthwith all the affected Indiana state governmental entities of this injunction.

IT IS SO ORDERED.


Date: _____06/24/2011_____                    _Sarah Evans Barker_____

                                                  SARAH EVANS BARKER, JUDGE
                                                  United States District Court
                                                  Southern District of Indiana

Copies to:

Angela Denise Adams
LEWIS & KAPPES
aadams@lewis-kappes.com

Scott Leroy Barnhart
INDIANA OFFICE OF THE ATTORNEY GENERAL
scott.barnhart@atg.in.gov

William W. Barrett
WILLIAMS HEWITT BARRETT & WILKOWSKI LLP
wbarrett@wbwlawyers.com

Jose J. Behar
HUGHES SOCOL
70 Madison St
Chicago, IL 60602

Adam  Clay
INDIANA ATTORNEY GENERAL
Adam.Clay@atg.in.gov

Katherine  Desormeau
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
kdesormeau@aclu.org

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Wade Dunlap Fulford
Indiana Attorney General
wade.fulford@atg.in.gov

Lee  Gelernt
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
lgelernt@aclu.org

Jennifer Lynn Haley
CITY OF INDIANAPOLIS, CORPORATION COUNSEL
jhaley@indy.gov

Betsy M. Isenberg
INDIANA OFFICE OF THE ATTORNEY GENERAL
Betsy.Isenberg@atg.in.gov

Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
ojadwat@aclu.org

Linton  Joaquin
National Immigration Law Center
joaquin@nilc.org

Joshua  Karsh
HUGHES SOCOL PIERS RESNICK & DYM, LTD.
jkarsh@hsplegal.com

Jan P. Mensz
ACLU OF INDIANA
jmensz@aclu-in.org

Matthew J Piers
HUGHES SOCOL
70 Madison St.
Chicago, IL 60602

Justin F. Roebel
CITY OF INDIANAPOLIS, OFFICE OF CORPORATION COUNSEL
jroebel@indygov.org

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Robert Howard Schafstall
CUTSINGER & SCHAFSTALL
robhschafstall@gmail.com

Andre I. Segura
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
asegura@aclu.org

Karen  Tumlin
NATIONAL IMMIGRATION LAW CENTER
tumlin@nilc.org

Cecillia D. Wang
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
cwang@aclu.org

Tamara  Weaver
INDIANA ATTORNEY GENERAL
tamara.weaver@atg.in.gov