UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INGRID  BUQUER, | ) | |
| BERLIN  URTIZ, | ) | |
| LOUISA  ADAIR on their own behalf and | ) | |
| on behalf of those similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF INDIANAPOLIS, | ) | No. 1:11-cv-00708-SEB-MJD |
| MARION COUNTY PROSECUTOR in | ) | |
| his official capacity, | ) | |
| CITY OF FRANKLIN, | ) | |
| JOHNSON COUNTY SHERIFF in his | ) | |
| official capacity, | ) | |
| JOHNSON COUNTY PROSECUTOR in | ) | |
| his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PENDING SUMMARY JUDGMENT MOTIONS**

Plaintiffs, Ingrid Buquer, Berlin Urtiz, and Louisa Adair, on their own behalf and

on behalf of those similarly situated, challenge Section 18 (currently codified at Indiana

Code § 34-28-8.2) and Section 20 (currently codified at Indiana Code § 35-33-

1(1)(a)(11)-(13)) of the 2011 Senate Enrolled Act ("SEA") 590[1] as unconstitutional and

---

[1] Section 20 amends Indiana Code ' 35-33-1-1(1), by adding new sections (a)(11)-(a)(13),
authorizing state and local law enforcement officers to make a warrantless arrest of a person
when the officer has a removal order issued for the person by an immigration court, a detainer or
notice of action issued for the person by the United States Department of Homeland Security, or

preempted by federal law.[2]  On June 24, 2011, the Court entered a preliminary injunction

in favor of Plaintiffs, enjoining Defendants, the City of Indianapolis ("the City"); the City

of Franklin; the Marion County Prosecutor, in his official capacity; the Johnson County

Sheriff, in his official capacity; and the Johnson County Prosecutor, in his official

capacity, from enforcing Sections 18 and 20 until further order of the Court.

On November 20, 2011, Plaintiffs filed a motion for summary judgment [Docket

No. 122], requesting that the previously entered preliminary injunction be made

permanent and that judgment be entered in their favor against all Defendants.  On

December 21, 2011, the City filed its response in opposition to Plaintiffs' motion for

summary judgment as well as a cross-motion for summary judgment [Docket No. 137],

arguing that Plaintiffs have failed to identify an improper municipal custom, policy, or

practice sufficient to support their claim against the City brought pursuant to 42 U.S.C. §

---

has probable cause to believe the person has been indicted for or convicted of one or more
aggravated felonies.  Section 18 creates a new infraction under Indiana law for any person (other
than a police officer) who knowingly or intentionally offers or accepts a consular identification
card as a valid form of identification for any purpose.

[2] In the State Defendants' introduction to their response in opposition to Plaintiffs' motion for
summary judgment, they argue in a few sentences that the two preemption challenges are the
only claims being raised on behalf of the class and that the Fourth Amendment and due process
challenges are raised only by the named plaintiffs.  Not only is their argument undeveloped, it is
also unsupported by the record.  The parties stipulated that the law or fact common to each class
is whether the challenged provisions are "preempted by Federal law *and* [] unconstitutional."
Docket No. 84 (emphasis added).  This clearly encompasses both the preemption claims and the
Fourth Amendment and due process constitutional challenges.  Moreover, the State Defendants
admitted in their Answer, which was filed after the class stipulation, that the questions of law or
fact common to Class A include: "(1) whether SEA 590 violates the Fourth Amendment of the
U.S. Constitution; and (2) whether SEA 590 is preempted."  Docket No. 86.  Similarly, in their
Answer, the State Defendants admitted that Class B presents common questions, including: "(1)
whether SEA 590 is preempted by the U.S. Constitution and federal law; and (2) whether SEA
590 violates the Due Process Clause of the U.S. Constitution."  *Id.*

1983, but otherwise taking no position on the merits of the substantive claims as applied

to the other Defendants.  On January 4, 2012, Plaintiffs filed their response in opposition

to the City's cross-motion for summary judgment.  The City filed its reply on January 23,

2012, and Plaintiffs filed a surreply on January 30, 2012.

After discovery, on April 9, 2012, the Office of the Attorney General, representing

the Marion and Johnson County Prosecutors ("the State Defendants"), filed its response

opposing Plaintiffs' motion for summary judgment.  In its response, the Office of the

Attorney General requested not only that Plaintiffs' motion be denied but also that

summary judgment be issued for the state officials.  The Attorney General did not file a

separate motion for summary judgment, however.  On April 20, 2012, Plaintiffs filed

their reply in support of their motion for summary judgment, at which point both

summary judgment motions were fully briefed.

After careful review of the parties' submissions, documentary evidence, and

applicable legal authorities, we <u>GRANT</u> Plaintiffs' Motion for Summary Judgment as to

the State Defendants and hereby <u>PERMANENTLY ENJOIN</u> enforcement of Sections 18

and 20 of SEA 590.  Plaintiffs' claim against the City of Indianapolis is <u>DISMISSED</u>

<u>WITHOUT PREJUDICE</u> as unripe.

### **Factual Background**[3]

## I.      **Federal Immigration Regulation**

---

[3] We discussed these facts in our prior entry granting Plaintiffs' request for preliminary
injunctive relief and they have been altered here only to the extent required to reflect any
changes necessitated by the Court's review of the parties' summary judgment briefing.

In 1952, Congress enacted the Immigration and Nationality Act (AINA@), 66 Stat. 163, as amended, 8 U.S.C. ' 1101 *et seq*. "That statute established a ›comprehensive federal statutory scheme for regulation of immigration and naturalization‹ and set ›the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Chamber of Commerce of U.S. v. Whiting*, 131 S.Ct. 1968, 1973 (2011) (quoting *De Canas v. Bica*, 424 U.S. 351, 353, 359 (1976)).  The INA empowers the Department of Homeland Security (ADHS@), the Department of Justice (ADOJ@), and the Department of State, among other federal agencies, to administer and enforce immigration law.  Within DHS, various sub-agencies, including the United States Immigration and Customs Enforcement (AICE@), the United States Customs and Border Protection (ACBP@), and the United States Citizenship and Immigration Services (AUSCIS@), are tasked with immigration related responsibilities.

In certain limited situations, federal law permits the delegation of authority to enforce civil immigration law to state and local law enforcement.  For example, DHS is permitted to enter into written agreements (known as "287(g) agreements") with states or any political subdivision of a state to allow appropriately trained and supervised officers or employees of the state or subdivision to perform certain immigration responsibilities. 8 U.S.C. ' 1357(g)(1).  It is undisputed that Indiana has no such agreement with the federal government.

Defendants stress the fact that local Indiana law enforcement officials nevertheless often cooperate with federal agencies in the performance of the enforcement of

immigration-related laws, citing an October 2011 "mini-criminal alien surge" spearheaded by ICE in which 138 removable aliens were identified in three Indiana county jails over a four-day period.  After identifying the criminal aliens, ICE removed six criminal offenders who were then transferred to the Marion County Jail.  Exh. G. However, when such cooperative enforcement efforts occur, the local law enforcement officers are enlisted by and perform their duties at the behest of the federal officials who are authorized to perform these responsibilities.

## II.   Section 20

In an apparent attempt to give law enforcement powers to local officials independent of federal supervision and/or authority such that they could act unilaterally, Section 20 of the Act was enacted to amend Indiana Code ' 35-33-1-1(1), by adding new sections (a)(11)-(a)(13), which provide as follows:

(a) A law enforcement officer may arrest a person when the officer has:

\*\*\*

(11)   a removal order issued for the person by an immigration court;

(12)   a detainer or notice of action for the person issued by the United States Department of Homeland Security; or

(13)   probable cause to believe that the person has been indicted for  or convicted of one (1) or more aggravated felonies (as defined in 8 U.S.C. 1101(a)(43)).

An understanding of the material phrases incorporated in this statute is necessary; that discussion ensues:

### A.   Removal Order

5

The INA contains provisions which, *inter alia*, set forth the conditions under which a foreign national may be admitted to and remain in the United States, establish civil penalties and criminal sanctions for immigration violations, and grant DHS the discretion to place non-citizens into removal proceedings for various actions.  *See, e.g.*, 8 U.S.C. ' ' 1181-1182, 1184, 1225, 1227-1229, 1306, 1324-25.  Unlawful presence in the United States on its own is not a federal crime, although it can lead to the civil remedy of removal.  8 U.S.C. ' ' 1182(a)(6)(A)(I), 1227(a)(1)(B), (C).  Removal proceedings take place within an administrative immigration court system within the DOJ.  8 C.F.R. ' 1003.0, *et seq*.

If the Attorney General of the United States issues a warrant after removal proceedings have been initiated against an individual under federal law, that person may be arrested and detained pending a final removal decision.  8 U.S.C. ' 1226(a).  However, removal does not occur in every case.  After removal proceedings are initiated, the non-citizen may still be released during the pendency of removal proceedings, or even after the removal order has been issued by an immigration judge.  Under 8 U.S.C. ' 1226(a), the individual may be released on bond or conditional parole, or, in some cases, be provided with work authorization.  *Id.* ' 1226(a)(3).  After a removal order is issued by an immigration judge, the non-citizen has the right to seek reconsideration as well as administrative and judicial review of that determination and may be released on bond until a final determination is made.  8 U.S.C. ' 1229a(c)(5).  Even after issuance of a final removal order, the individual may, in some circumstances, move to reopen the

removal proceedings, which may stay his/her removal pending final disposition of the motion. *Id.* ' 1229a(c)(7).  If the Attorney General fails to remove the non-citizen within ninety days after the removal order becomes final, the individual is released from detention, subject to supervision by the Attorney General.  8 U.S.C. ' 1231(a)(3).  Finally, in lieu of deportation, the Attorney General may allow an alien to voluntarily depart the United States during a predetermined period of time.  8 U.S.C. ' 1229c.

**B.** **Detainer**

If federal or local law enforcement informs ICE that an alien is in custody on non-immigration related charges, ICE may issue a detainer requesting that the law enforcement agency hold the individual for up to 48 hours (not including weekend days and holidays) beyond the time that the detainee would otherwise be released in order to allow ICE to assume custody, if it chooses to do so.  8 C.F.R. ' 287.7(d).  A detainer is not a criminal warrant, but rather a voluntary request that the law enforcement agency "advise [DHS], prior to release of the alien, in order for [DHS] to arrange to assume custody." *Id.* ' 287.7(a).  The detainer automatically expires at the end of the 48-hour period. *Id.*

**C.** **Notice of Action**

The standard form that federal immigration authorities utilize to inform individuals with pending petitions of any sort before the agency of the status of their cases is known as the Notice of Action Form, Form I-797.  This form may be used to notify a person of a wide variety of administrative actions, including that a petition or

application with the agency has been received, that a decision has been made on a petition or application, and may even be used to notify an individual that he or she has been granted lawful status.  Because an I-797 form is essentially simply a communication between the agency and the petitioner issued for any one of a wide range of administrative reasons, receipt of a notice of action is not a reliable indicator of an individual=s immigration status, or whether an individual has engaged in illegal activity, or the circumstances surrounding the individual=s presence in the United States.

Notices of Action also include other forms issued by DHS, including Form 29, which is issued to importers by Customs and Border Protection, a subagency within DHS.  Another Notice of Action is Form I-247, which is an immigration detainer described above.

### D.     Aggravated Felonies

The INA provides that an alien convicted of an "aggravated felony" is subject to removal and may not receive asylum in the United States, become a citizen, lawfully reenter the United States, or have removal orders cancelled by the Attorney General.  8 U.S.C. ' ' 1158(b)(2)(A)(ii), (b)(2)(B)(I); 1227 (a)(2)(A)(iii); 1229b(a)(3).  However, it is often unclear whether a particular crime constitutes an aggravated felony under federal immigration law.  "Aggravated felony" is defined under 8 U.S.C. ' 1101(a)(43), which encompasses 21 subsections, many of which themselves contain multiple crimes.  Thus, determining whether a particular crime meets the definition is often a complex analytical

undertaking, one with which courts routinely grapple as have Executive Branch agencies and departments charged with enforcing this law.

## III.   Section 18

Section 18 of the Act, to be codified as Indiana Code ' 34-28-8.2, provides:

Chapter 8.2.  Offenses Related to Consular Identification

Sec. 1.  As used in this chapter, Aconsular identification@ means an identification, other than a passport, issued by the government of a foreign state for the purpose of providing consular services in the United States to a national of the foreign state.

Sec. 2.  (a) This section does not apply to a law enforcement officer who is presented with a consular identification during the investigation of a crime.

(b) Except as otherwise provided under federal law, a person who knowingly or intentionally offers, accepts, or records a consular identification as a valid form of identification for any purpose commits a Class C infraction. However, the person commits:

(1) a Class B infraction for a second offense; and
(2) a Class A infraction for a third or subsequent offense.

**Consular Identification Documents ("CIDs"):**

The Vienna Convention on Consular Relations ("VCCR"), to which the United States is a signatory, provides, *inter alia*, that a foreign consulate may issue travel documents, visas, or other appropriate documents to protect and assist its citizens in the foreign country.  Vienna Convention on Consular Relations and Optional Protocol on Disputes, Art. 5(a), (d), (e), T.I.A.S. No. 6820, 21 U.S.T. 77, 1969 WL 97928 (Dec. 14, 1969).  Consular identification documents ("CIDs") are photo identification cards issued by many embassies and consulates, including the United States, "to encourage their

9

citizens abroad to register with the consulates so that they can receive standard consular services, be notified if necessary, and be located upon inquiry by relatives and authorities." Congressional Research Service, *Consular Identification Cards: Domestic and Foreign Policy Implications, the Mexican Case, and Related Legislation* at CRS-1 (2005), *available at* http://www.fas.org/sgp/crs/misc/RL32094.pdf (last visited March 28, 2013). It is an accommodation made by a foreign government with and for its own citizens who are temporarily residing in the United States (or elsewhere we assume).

Under the VCCR, a foreign national arrested or detained in the United States must be advised of his or her right to request that appropriate consular officials be timely notified of the individual's detention. Thus, individuals can use CIDs to alert federal, state, and local law enforcement authorities of the need to notify consular officials when assistance is required. Cardholders also commonly use CIDs for identification purposes, such as with financial institutions, law enforcement agencies, and state and local governments in the United States, as well as for other transactions that require photo identification, including cashing checks, renting housing, or enrolling children in school, especially when no other forms of photo identification are available to them for their use.

The parties stipulate that limitations or restrictions on the use of these documents in connection with official state matters is a permissible exercise of state governmental authority. As for the non-state governmental uses, however, the parties disagree as to their lawfulness.

## IV.    Background on the Named Plaintiffs

10

**Ingrid Buquer** is a Mexican citizen who resides in Johnson County (Indiana) and also spends a significant amount of time in Marion County.  She applied for a U-Visa as a victim of, or a witness to, a violent crime, and her application was still pending at the time the preliminary injunction in this case was issued.  However, in April 2012, her application was granted and she has now received her employment authorization card.  *See* 8 U.S.C. ' 1101(a)(15)(U).  She received an I-797 Notice of Action to inform her of the pendency of her U-Visa application and another Notice of Action when her U-Nonimmigrant Status was approved.[4]

Ms. Buquer has also received a CID from the Mexican Consulate in Indianapolis, which she uses in both Johnson and Marion Counties for many purposes, such as banking and shopping as well as in other situations in which identification is required.  She has at times presented her CID when receiving services at the Mexican Consulate as proof of her Mexican citizenship.  At the time the preliminary injunction was issued in this case, Ms. Buquer was unable to obtain an identification card or license from the State of Indiana.  However, as of February 2012, she was able to obtain a passport from the Mexican Consulate, and thus, now has an alternative to her CID for identification purposes.  *See* Buquer Dep. at 13-14; Buquer Dep. Exh. B.  Plaintiffs contend that, because Ms. Buquer has received a Notice of Action, she will be subject to warrantless arrest pursuant to Section 20 when and if the law goes into effect.  Additionally, when

---

[4] In a footnote, the State Defendants note that these developments "may affect Buquer's ability to continue as class representative and will be reviewed."  Defs.' Resp. at 2.  However, Defendants have not developed this argument, and thus, we do not address it further.

11

and if Section 18 goes into effect, she will not be able to use her CID for identification without being subject to a civil infraction.

**Louisa Adair** is a citizen of Nigeria who currently resides in Marion County.  Ms. Adair had a removal order issued against her in 1996, but she is currently released by ICE on an Order of Supervision, under which she reports to ICE every six months.  She has been issued a valid work authorization document from DHS and she receives a I-797 Notice of Action each time she applies to renew her employment authorization card.  Ms. Adair has filed a Motion to Reopen and Terminate Removal Proceedings and has also made a formal request that the ICE Chief Counsel=s office exercise its prosecutorial discretion and join in her in that motion.  If her request is granted, she will be eligible to apply for lawful permanent residency because her mother is a citizen of the United States and Ms. Adair possesses an approved and current I-130 visa petition.  Ms. Adair also received an I-797 Notice of Action approving the I-130 petition that establishes her relationship to her citizen-mother.  Plaintiffs contend that, because Ms. Adair has received both a removal order and various Notice of Action forms, she will be subject to warrantless arrest by Indiana law enforcement officers when and if Section 20 goes into effect.

**Berlin Urtiz** is a citizen of Mexico who came to the United States when he was three years old and currently resides in Marion County.  He has been a lawful permanent resident of the United States since 2001.  In 2004, Mr. Urtiz was convicted of theft in Johnson County and sentenced to two years in prison, which was subsequently suspended

to probation.  This crime was initially determined to be an aggravated felony under 8

U.S.C. ' 1101(a)(43), and, in 2010, he was taken into custody by ICE and detained for

four months pending removal.  However, in September 2010, he was granted post-

conviction relief.  His theft conviction was vacated in November 2010 and he was re-

sentenced for the misdemeanor offense of conversion, which does not qualify as an

aggravated felony.  Currently, there are no removal proceedings pending against Mr.

Urtiz and he remains a lawful permanent resident, but Plaintiffs contend that, inasmuch

as he has been convicted of an aggravated felony in the past, he will be subject to

warrantless arrest by Indiana law enforcement officers on this basis when and if Section

20 goes into effect.

## V.   The Certified Classes

On July 14, 2011, the Court, pursuant to the parties' stipulation, certified this

cause as a class action, with two separate classes, pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(2).  Class A is defined as follows:

> All persons in Marion and Johnson Counties, Indiana, or who will be in
> Marion and Johnson Counties, Indiana, who are or will be subject to
> warrantless arrest pursuant to Section 19 of SEA 590 based on a
> determination that: a removal order issued against them by an immigration
> court; have or will have, a detainer or notice of action issued against them
> by the United States Department of Homeland Security; or they have been,
> or will be, indicted for or convicted of one (1) or more aggravated felonies,
> as defined in 8 U.S.C. § 1101(a)(43).

Docket No. 84.  Class B is defined as follows:

13

> All persons in Marion and Johnson Counties, Indiana, or who will be in Marion and Johnson Counties, Indiana, who possess, or will possess, a valid consular identification card and are using it, or will use it, for non-fraudulent identification purposes.

*Id.*

## Legal Analysis

### I.    Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Courts often confront cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." *Kohl v. Ass'n. of Trial Lawyers of Am.*, 183 F.R.D. 475 (D.Md.1998). Thus, in

determining whether genuine and material factual disputes exist in this case, the Court has considered the parties= respective memoranda and the exhibits attached thereto, and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

## II.     Plaintiffs' Motion for Summary Judgment as to State Defendants

The Court previously addressed all issues presented in this litigation in our June 24, 2011 Order preliminarily enjoining enforcement of the challenged sections of SEA 590.  Now, after further careful review of the parties' summary judgment briefing, a completely developed factual record, and the applicable legal authorities, our view of the appropriate final determination of these issues remains unchanged.  Drawing substantially from our June 24, 2011 Order, significant portions of which are incorporated herein, we have modified and extended that preliminary analysis only to the extent necessitated by recent judicial decisions as addressed in the parties' summary judgment and supplemental briefing.

### A.  Section 20

#### 1.  Preemption

Pursuant to the Supremacy Clause, it is "[a] fundamental principle of the Constitution ... that Congress has the power to preempt state law."  *Crosby v. Nat=l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citations omitted).  Preemption, express or implied, "is compelled whether Congress= command is explicitly stated in the

16

statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977) (citations omitted).  In cases in which Congress has not explicitly provided for preemption in a given statute, state law must nonetheless yield in two circumstances:  First, "[w]hen Congress intends federal law to 'occupy the field,' state law in that area is preempted."  *Crosby*, 530 U.S. at 372.  Second, even if Congress has not expressly occupied the field, state law is preempted where it conflicts with federal law.  Conflicts arise when "compliance with both federal and state regulations is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (internal quotations and citations omitted).  To determine whether "obstacle" preemption exists, a court must employ its "judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.  *Crosby*, 530 U.S. at 373.

Here, Section 20 of newly enacted Indiana statute authorizes the arrest of individuals in Indiana who are the subjects of a removal order, a detainer or notice of action, or a past indictment for or conviction of an aggravated felony.  It is undisputed that none of these matters is itself a crime and, without more, does not provide the usual predicate for an arrest.  As the Supreme Court recently made clear in *Arizona v. United States*, 132 S.Ct. 2492 (2012), "[t]he federal statutory structure instructs when it is appropriate to arrest an alien during the removal process."  *Id.* at 2505.  Yet, as noted in our order granting preliminary injunctive relief, Section 20 authorizes state and local law

enforcement to arrest in circumstances far broader than those in which Congress has allowed state and local officers to arrest immigrants, (8 U.S.C. ' 1252c),[5] and, in fact, authorizes a much broader warrantless arrest power than even federal officers are given under federal law.  8 U.S.C. ' 1357(a)(2).[6]  There is absolutely no indication that Congress intended state and local law enforcement officers to retain greater authority to effectuate a warrantless arrest than do trained federal immigration officials.

In *Arizona*, the Supreme Court addressed, *inter alia*, a provision of the State of Arizona's Support Our Law Enforcement and Safe Neighborhoods Act (commonly

---

[5] Pursuant to 8 U.S.C. ' 1252c, state and local officers are given the authority, "to the extent permitted by relevant State and local law," to arrest and detain an individual who:

(1) is an alien illegally present in the United States; and

(2) has previously been convicted of a felony in the United States and deported or left the United States after such conviction,

but only after the State or local law enforcement officials obtain appropriate confirmation from the Immigration and Naturalization Service of the status of such individual and only for such period of time as may be required for the Service to take the individual into Federal custody for purposes of deporting or removing the alien from the United States.

[6] Under 8 U.S.C. ' 1357(a)(2), federal officers are authorized to arrest without a warrant any alien:

who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.

referred to as S.B. 1070), which provided that state and local law enforcement officers "without a warrant, may arrest a person if the officer has probable cause to believe … [the person] has committed any public offense that makes [him] removable from the United States." *Id.* at 2505 (quoting ARIZ. REV. STAT. ANN. § 13-3883(A)(5)) (alterations in original).  The Court declared that provision to be preempted by federal law, observing that it would provide state officers greater arrest power in the immigration realm than Congress provided to federal immigration officers.  The Court emphasized that Arizona's authority under the challenged provision "could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case," which "would allow the State to achieve its own immigration policy." *Id.* at 2506.

Similarly, in the case before us there is no indication that state or local law enforcement officers would be required to consult federal immigration officials before effecting an arrest pursuant to Section 20.  Given the broad warrantless arrest powers provided in Section 20, it is reasonable to predict that many arrests authorized under that provision would directly contravene the federal government's immigration enforcement scheme.  For example, Section 20 authorizes an arrest of any individual who is in receipt of a removal order.  However, having received a prior removal order is not proof that the person is subject to detention by federal authorities and, in many cases, with the permission of federal authorities, individuals with removal orders can remain free from custody and obtain work authorization.  In such circumstances where the federal government has exercised its discretion to release an individual who has had a removal

19

order issued, the subsequent arrest of that person by Indiana law enforcement officers would directly conflict with the federal decision, obviously and seriously interfering with the federal government≤s authority in the field of immigration enforcement.

The conflict is even more apparent with regard to Section 20's authorization of the arrest of individuals who have been issued a notice of action.  Many such notices of action an alien might receive are inherently non-criminal.  Thus, receipt of such a form often merely acknowledges that the individual's information dealing with immigration matters has been received by INS or that an immigration decision is pending or has been made.  Such communications clearly could be as legally innocuous as informing the recipient that a visa application has been received and is being processed or even that he or she has attained lawful alien status.  Even if it were presumed that state and local law enforcement officers would utilize their arrest powers prudently, for example, only in cases where the notice of action received by the alien is "substantive" or "non-benign," no such limitation appears in Section 20 nor are those terms defined, leaving to anyone≤s guess what would constitute a "non-benign" or "substantive" notice of action or how any Indiana law enforcement officer could be expected to know the basis for such a distinction.[7]  Clearly, it is not the intent or purpose of federal immigration policy to arrest

---

[7] The State Defendants contend that the use of the phrase "*a* detainer *or* notice of action" (emphasis added) in Section 20 makes clear that the General Assembly intended to give law enforcement officers the ability to arrest only those individuals who had a Form I-247 "Immigration Detainer – Notice of Action" as opposed to merely having any "run-of-the-mill" Notice of Action.  Defs.' Resp. at 17.  The State Defendants further argue that, if the statute was meant to refer to all notices of action and not simply a Form I-247 detainer, it would have instead provided that an arrest could be made if the individual had "*a* detainer or *a* notice of action."

individuals merely because they have at some point had contact with a federal administrative agency concerning an immigration matter and have received notice to that effect.  Authorizing an arrest for nothing more than the receipt of an administrative notification plainly interferes with the federal government=s purpose of keeping those involved in immigration matters apprised of the status of their cases, *but not arresting* them.

Federal law specifies that the immigration penalties associated with aggravated felonies arise only if the individual has been *convicted* of the offense.  8 U.S.C. ' 1101(a)(43).  Yet Section 20 allows state and local law enforcement to arrest those concerning whom they have probable cause to believe have merely been *indicted* for such an offense.  Obviously, whether a crime constitutes an "aggravated felony" can often involve a complex and confusing legal and factual analyses, but there is no guidance in Section 20 as to how a state or local officer should make that determination.  Thus, the power to arrest on that basis threatens serious abuses.  Regardless, authorizing the arrest of individuals who have only been indicted but not convicted of an aggravated felony runs counter to the federal intent to limit such penalties.  Even in cases where a conviction has occurred, if the federal government determines that no penalty will be

---

(emphasis added).  However, as Plaintiffs argue, it is both permissible and common for a single article to be used to modify multiple nouns that are listed in the disjunctive, and, in fact, another sub-section of the same statute at issue here permits an individual's arrest when an officer has probable cause to believe the person has committed "*a* battery resulting in bodily injury under IC 35-42-2-1 *or* domestic battery under IC 35-42-2-1." IND. CODE § 35-33-1-1(a)(5) (emphasis added).  This is but one of a myriad of examples contained in the Indiana Code.

21

imposed, a subsequent arrest by state authorities pursuant to Section 20 directly conflicts with the federal determination.

It is true that there are certain instances in which state and local law enforcement officers may be authorized to assist the federal government in immigration matters.  But such circumstances are limited and clearly defined under federal law.  For example, as discussed above, DHS may enter into written agreements with states or any political subdivision of a state to allow appropriately trained and supervised officers or employees of the state or subdivision to perform certain immigration responsibilities subject to the Attorney General's discretion and supervision.  *See* 8 U.S.C. ' 1357(g)(1), (g)(3); *see also* § 1103(a)(10) (authority may be extended in the event of an "imminent mass influx of aliens off the coast of the United States"); § 1252c (authority to arrest in specific circumstances after consultation with the federal government).  However, it is undisputed that Indiana has entered into no such agreement with DHS.  Nor is the authority granted by Section 20 justified under 8 U.S.C. § 1357(g)(10)(B), which allows state officers to "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States."  As the Supreme Court recognized in *Arizona*, "[t]here may be some ambiguity as to what constitutes cooperation under federal law; but no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government."  132 S.Ct. at 2507.  Similarly, here, the unilateral discretion granted state and local law

22

enforcement officers to arrest under Section 20 goes far beyond the types of cooperation contemplated by § 1357(d).  *See id.* (citing Dept. of Homeland Security, Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters 13-14 (2011), online at http://www.dhs.gov/files/resources/immigration.shtm (last visited March 28, 2013) (providing examples of what constitutes "cooperation" under federal law, including situations in which states participate in a joint task force with federal officers, provide operational support in executing a warrant, or permit federal immigration officials to gain access to detainees held in state facilities)).

Federal immigration law consists of a veritable tapestry of individual regulatory and policy threads woven together to create a balanced whole.  In order to maintain that balance throughout the country, federal law vests discretion at the federal level regarding whether and which persons without full, lawful alien status should be arrested.  Section 20 impermissibly alters that balance by authorizing the arrest for immigration matters of individuals only within the boundaries of the State of Indiana whom, in many cases, the federal government does not seek or intend to be detained.  As such, Section 20 significantly disrupts and interferes with federal discretion relating to immigration enforcement and the appropriate, preferred methods for carrying out those enforcement responsibilities.  Accordingly, we hold that Section 20 of SEA 590 is preempted by federal law.

### 2.  Fourth Amendment and Due Process

Even if Section 20 were not preempted by federal law, because it authorizes state and local law enforcement officers to effect warrantless arrests for matters that are not crimes, it runs afoul of the Fourth Amendment, and thus, is unconstitutional on those grounds.  "[A]n arrest is reasonable under the Fourth Amendment so long as there is probable cause to believe that *some* criminal offense has been or is being committed."  *Fox v. Hayes*, 600 F.3d 819, 837 (7th Cir. 2010) (emphasis in original) (citations omitted).  When a federal court is tasked with evaluating a facial challenge to a state law, the court must "consider any limited construction that a state court or enforcement agency has proffered."  *Ward v. Rock Against Racism*, 491 U.S. 781, 795-96 (1989) (quoting *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982)).  However, "a federal court may not slice and dice a state law to 'save' it; we must apply the Constitution to the law the state enacted and not attribute to the state a law we could have written to avoid the problem."  *K-S Pharmacies, Inc. v. Am. Home Products, Corp.*, 962 F.2d 728, 730 (7th Cir. 1992) (citations omitted).

Defendants maintain that the Court is obligated to presume that the arrest provisions set forth in Section 20 will be applied constitutionally, that is, in accordance with the Fourth Amendment and due process requirements, and thus, that these expanded arrest powers would be utilized only in conjunction with an otherwise lawful arrest.  We are no more persuaded by Defendants' argument now than we were at the preliminary

24

injunction stage; therefore, we incorporate much of our prior order into our discussion here.

We begin by noting that Defendants' interpretation of Section 20 completely ignores the plain language of that statute. Section 20 expressly provides that state and local enforcement officers "may arrest" individuals for conduct that all parties stipulate and agree is not criminal. The statute contains no reference to Fourth Amendment protections nor does it include a requirement that the arrest powers granted to law enforcement officers under Section 20 be used only in circumstances in which the officer has a separate, lawful reason for the arrest. Moreover, accepting Defendants' proposed construction would, in effect, read the statute out of existence. Apart from the exclusion of Fourth Amendment requirements regarding probable cause to arrest, Section 20 bestows no authority on law enforcement officers beyond the power to arrest for the non-criminal conduct enumerated therein, creating a deafening silence as to what happens to the arrestee post his or her arrest. There is no mention of any requirement that the arrested person be brought forthwith before a judge for consideration of detention or release. There is, in fact, a complete void within the newly enacted statute regarding all other due process protections. Our acceptance of Defendants' theory would require the Court to construe the state statute under review contrary to its plain language, which very plainly authorizes law enforcement officials to arrest an individual without regard to whether that individual was already subject to a lawful arrest. Such an interpretation,

25

apart from being based on nothing within the text of the statute itself, would render Section 20 completely meaningless. We cannot and shall not interpret a statute in such an unprincipled fashion. *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008).

Defendants emphasize the fact that Section 20 does not mandate arrests; rather it merely grants discretionary authority to law enforcement officers to arrest. However, Defendants fail to explain the significance of this difference and we see none, since it is clear that "[i]t is the high office of the Fourth Amendment to constrain law enforcement discretion." *Hedgepeth ex rel. Hedghpeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1159 (D.C. Cir. 2004). Nor are we persuaded by Defendants argument that the law in fact requires a "*higher* standard than probable cause" because it requires the officers to actually "have" certain documents in their possession before exercising their discretion under Section 20, to wit, a removal order from an immigration court, a detainer or notice of action from DHS, or probable cause to believe that an individual was indicted or convicted of an aggravated felony. Defs.' Resp. at 14. However, even assuming that "have" is interpreted to require physical possession, being in possession of any of the documents enumerated in Section 20 does not provide lawful cause for arrest under the Fourth Amendment.

In short, if the Court were to accept Defendants= proposed construction of the arrest powers provision, it would require a radical rewriting of Section 20, which the Court is not empowered to do. Even if such broad interpretive powers were permissible,

and we repeat, they are not, the construction Defendants have proposed would be entirely untenable because, as we have noted above, it would render the challenged statute meaningless. Accordingly, we find that Section 20 is susceptible to only one interpretation, to wit, that it authorizes the warrantless arrest of persons for matters and conduct that are not crimes. Because such power contravenes the Fourth Amendment, Section 20 is unconstitutional.[8]

### B. Section 18

#### 1. Preemption

Plaintiffs argue that Section 18 is an impermissible state regulation of immigration because it interferes with the rights bestowed on foreign nations by treaty as well as with the federal government≈s responsibilities for the conduct of foreign relations, and is thus preempted. Defendants rejoin that the statute does not directly conflict with any treaty nor does it impede the federal government≈s ability to manage foreign affairs, because Section 18 is merely a regulation of acceptable forms of identification to be used within

---

[8] Defendants have apparently abandoned their argument set forth at the preliminary injunction phase that it is as yet undetermined whether the Fourth Amendment even applies to undocumented aliens. Even if they have not abandoned that argument, we read the caselaw to say otherwise. Following the Supreme Court≈s decision in *Immigration and Naturalization Service v. Lopez-Menoza*, 468 U.S. 1032 (1984), in which the Court accepted the principle that the Fourth Amendment does apply to undocumented individuals, courts, including the Seventh Circuit, routinely apply the Fourth Amendment in cases involving undocumented aliens. *See, e.g.*, *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010); *United States v. Villegas*, 495 F.3d 761 (7th Cir. 2007).

the State of Indiana and does not single out or conflict with any identifiable immigration policy or regulation or make any determination as to who is allowed to be admitted into the country or who is allowed to remain once admitted.

Under the Vienna Convention of Consular Relations ("VCCR"), to which the United States is a signatory, foreign consulates are granted permission to issue travel documents, such as passports and visas, as well as other "appropriate documents" to its citizens and to protect and assist its citizens in the foreign country. *See* Vienna Convention on Consular Relations and Optimal Protocol on Disputes, Dec. 14, 1069, art. V(a), (d)-(e), 21 U.S.T. 77. Although CIDs are not specifically mentioned in the text of the VCCR, it is recognized that, pursuant to the powers set forth therein, CIDs are issued by many "embassies and consulates of foreign states, including the United States, to encourage their citizens abroad to register with the consulates so that they can receive standard consular services, be notified if necessary, and be located upon inquiry by relatives and authorities." Congressional Research Service, *Consular Identification Cards: Domestic and Foreign Policy Implications, the Mexican Case, and Related Legislation*, at CRS-1 (2005), *available at* http://www.fas.org/sgp/crs/misc/RL32094.pdf (last visited March 28, 2013); *see also Risk v. Kingdom of Norway*, 707 F. Supp. 1159, 1165 (N.D. Cal. 1989), *aff'd sub nom. Risk v. Halvorsen*, 936 F.2d 393 (9th Cir. 1991) ("The issuance of identification documents is a function recognized as being among the powers exercised by consular officials by the [VCCR].").  Moreover, in congressional

28

testimony, a U.S. State Department official testified that the State Department views CIDs as a tool for law enforcement officers to help facilitate observance of the United States' treaty obligations. *See* Testimony of Acting Deputy Assistant Secretary of State Roberta Jackson for the Bureau of Western Hemisphere Affairs, *Hearing on the Federal Government's Response to Consular Identification Cards Before the House Subcommittee on Immigration, Border Security, and Claims, House Committee on the Judiciary*, 108th Cong. 44-45, at 142-43 (Jun. 26, 2003) (hereinafter "CID Hearing").

We agree with Defendants that Section 18 does not directly conflict with the VCCR because the statute neither prevents consulates from issuing CIDs nor, arguably, from accepting a CID at the consulate itself. However, as we ruled in our prior order granting preliminary relief to Plaintiffs, while Section 18 does not prohibit a consulate from issuing CIDs, it in essence makes their issuance meaningless as it prohibits almost every use for which the documents are ordinarily issued, including for identification purposes in private commercial and banking transactions conducted between private parties. In light of this extensive limitation imposed by Section 18, we are unable to dismiss the statute's impact as inconsequential. In fact, it appears that the statute directly interferes with the rights bestowed on foreign nations by treaty by virtually nullifying the issuance of one of the tools used by foreign nations to exercise those rights.

It is also clear that such a sweeping prohibition has the potential to directly interfere with executive discretion in the field of foreign affairs. The executive branch=s

authority over matters of foreign affairs is an implied constitutional power.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952).  "The exercise of the federal executive authority means that state law must give way where ... there is evidence of clear conflict between the policies adopted by the two."  *American Ins. Ass᾿n v. Garamendi*, 539 U.S. 396, 421 (2003).  The State Department has in the past cautioned the federal government against taking action against CIDs that might cause other countries to similarly restrict the use and acceptance of such documentation for American citizens abroad.[9]  *See* CID Hearing at 114 (Testimony of Acting Deputy Assistant Secretary of State Roberta Jackson).

Defendants cite to cases in which courts have found state laws not preempted which deal with matters of traditional state regulation and which have only an indirect impact on foreign policy.  *See Dunbar v. Seger-Thomschitz*, 615 F.3d 574 (5th Cir. 2010) *cert. denied*, 131 S.Ct. 1511 (2011) (holding that Louisiana prescription period applying generally to any challenge of ownership to movable property was not preempted even though the object of the litigation was Nazi-confiscated artwork); *Museum of Fine Arts, Boston v. Seger-Thomschitz*, 623 F.3d 1 (1st Cir. 2010) *cert. denied*, 131 S.Ct. 1612 (2011) *reh᾿g denied*, 10-901 2011 WL 1529816 (U.S. Apr. 25. 2011) (holding that statute

---

[9] The risk that a state law could result in similar retaliatory actions by foreign governments is no less a concern.  The potential impact that Section 18 has on the United States᾿ relationship and dealings with foreign countries is reflected in the concerns raised by Mexico, Brazil, Guatemala, El Slavador, and Colombia in their *amicus curiae* briefs filed in this action.

of limitations on conversion was statute of general regulation that does not conflict with federal policy).  Defendants maintain that, similar to the statutes of general application directed toward matters of state concern, Section 18 "does not single out any identifiable immigration policy or regulation, but rather outlines acceptable forms of identification within the State of Indiana."  Defs.' Resp. at 26.

The defect in Defendants' argument here is that Section 18 is anything but a neutral law of general application that just happens to have a remote and indirect effect on foreign relations.  Rather, it targets only one form of identification B CIDs issued by foreign governments.  Moreover, Section 18 regulates CIDs in the broadest possible terms, restricting not just what state agencies may accept as valid identification but prohibiting this form of identification in purely private transactions.  "A person," the statute says, and that is all it says.  These sweeping regulations, targeted solely at foreign government-issued identification that consulates are entitled to issue, and which restrict the manner in which foreign citizens may travel, live, and trade in the United States, have a direct effect on our nation's interactions with foreign nations.  Such interactions cannot be dictated or restricted by individual states.  For these reasons, we hold that Section 18 is preempted by federal law.

### 2.  Due Process

Plaintiffs also challenge Section 18 on substantive due process grounds,[10] arguing that the statute is arbitrary and bears no rational relation to legitimate government interests. Defendants rejoin that the statute is rationally related to the legitimate government purpose of ensuring the reliability of identification of individuals within the state and preventing fraud against law enforcement, merchants, and consumers.

Under traditional due process analysis, state action must be sustained as long as it bears a rational relation to a legitimate governmental interest. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 406 (1992). Even under this highly deferential standard of review, however, we find that Section 18 is violative of due process principles. Although we do not dispute that the stated purpose of ensuring the reliability of identification of individuals within the state and preventing fraud against the *state* is a legitimate governmental purpose, the breadth of the limitation imposed by Section 18, to wit, preventing *any person* (other than a police officer) from either knowingly presenting or accepting a CID as a valid form of identification *for any purpose* far exceeds its stated purpose and therefore is not rational.

---

[10] Defendants argue that Plaintiffs' due process claim must fail because they have no liberty or property interest in CIDs. However, while a showing of a liberty or property interest is required to succeed on a procedural due process claim, (*see, e.g.*, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972)), there is no such requirement to establish a substantive due process violation, which is the claim at issue here. *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997) (holding that a statute not "rationally related to legitimate government interests" violates substantive due process). Accordingly, we need not address Defendants' procedural due process argument further.

While all parties agree that the State of Indiana has the authority to prohibit the use of various forms of identification, including CIDs, at state agencies, such as the Bureau of Motor Vehicles, Section 18 goes far beyond such regulation to prohibit their use or acceptance in any transaction requiring valid identification, even those between purely private parties who would otherwise be willing to accept CIDs in the context of wholly private transactions.  The parties here disagree as to the reliability of CIDs and have submitted competing evidence on that question.  However, even assuming that the level of reliability of CIDs varies from country to country, we are still persuaded that CIDs are, at the very least, as reliable as a number of other forms of documentation that individuals are permitted to use for certain identification purposes in Indiana, such as leases, utility bills, and student ID cards.  Accordingly, the General Assembly's decision to single out for punishment individuals using CIDs for identification purposes from all other individuals, many of whom are using other, arguably more unreliable forms of identification, simply does not rationally further the goal of the prevention of fraud or otherwise ensure the reliability of identification.

Additionally, Section 18 forces foreign nationals who are stopped by law enforcement and who may not have actual or practical access to identification other than a CID to choose either to subject themselves to a possible infraction or to decline to comply with a police officer's request for identification.  The statute immunizes the police officers who ask for identification in the course of a criminal investigation, but the

person who shows the officer a CID and thus "knowingly or intentionally offers … a

consular identification as a valid form of identification" commits an infraction under

Section 18.  The record establishes that one primary purpose of the CID is to assist and

identify foreign nationals who are stopped by law enforcement, and yet, if the CID is

used for one of its key purposes, the individual who uses it is subject to an infraction

under Section 18, but the police officer who asks for the identification is not.

These examples persuade us that, regrettably in our view, the distinction made in

Section 18 to single out the CID for regulation apart from other forms of identification

most accurately appears to have been designed simply to target foreign nationals.  As the

Supreme Court has recognized in the equal protection context, "if the constitutional

conception of 'equal protection of the laws' means anything, it must at the very least

mean that a bare congressional desire to harm a politically unpopular group cannot

constitute a legitimate governmental interest."  *United States Dep't of Agriculture v.*

*Moreno*, 413 U.S. 528, 534 (1973).  For these reasons, we hold that Section 18 is not

rationally related to the stated government interest, and thus, violates substantive due

process.

## III.    Plaintiffs' and the City's Cross-Motions for Summary Judgment

The City argues that, regardless of the merits of the substantive claims against the

other Defendants, it is entitled to summary judgment in its favor because Plaintiffs have

failed to establish that there is a municipal custom, policy, or practice at issue in this case

that violates federal law, and thus, under *Monell v. Department of Social Services*, 436

U.S. 658 (1978), the City cannot be held liable under § 1983.[11]  In analyzing a civil rights

claim against a municipality, the first inquiry "under § 1983 is the question whether there

is a direct causal link between a municipal policy or custom and the alleged constitutional

deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *accord Monell*, 436

U.S. at 694 ("[I]t is when execution of a government's policy or custom, whether made

by its lawmakers or by those whose edicts or acts may fairly be said to represent official

policy, inflicts the injury that the government as an entity is responsible under § 1983.").

In other words, the policy must be the "moving force" behind the violation.  *Monell*, 436

U.S. at 694.  "[M]unicipal liability under § 1983 attaches where – and only where – a

deliberate choice to follow a course of action is made from among various alternatives by

[the municipality] with respect to the subject matter in question."  *Pembaur v. City of*

*Cincinnati*, 475 U.S. 469, 484 (1986) (citation omitted).

     The City argues that Plaintiffs have failed to present evidence that the City has

made a conscious and deliberate decision to make arrests and issue citations under the

challenged portions of the state statute at issue here, and thus, cannot satisfy the standard

for municipal liability set forth in *Monell* and its progeny.  In other words, the City

contends that, because Sections 18 and 20 were preliminary enjoined prior to their

---

[11] Although the City's argument applies equally to the other municipal defendants in this
litigation, as Plaintiffs point out, it is not available to the prosecutor defendants represented by
the Office of the Attorney General because prosecutors are state officials under Indiana law.
*See, e.g.*, *Hendricks v. New Albany Police Dept.*, No. 4:08-cv-180, 2010 WL 4025633, at *3
(S.D. Ind. Oct. 13, 2010).

effective date, it never had any opportunity to decide if and how and when it would

enforce those provisions such that it could be said to have established a *Monell* policy.

The City further argues that, even if Plaintiffs could establish that the City has a policy to

enforce state law as a general matter, the mere enforcement of state law is insufficient to

subject the City to liability under § 1983.  Plaintiffs rejoin that the City can be held liable

under § 1983 based on the fact that enforcement of the sections of the statute at issue is

within the City's discretion and the City has not affirmatively stated that it would decline

to enforce Sections 18 and 20 of SEA 590, should those provisions ever go into effect.

  We note that the caselaw, both in this circuit and in our sister circuits, is not

entirely straightforward on the issue of whether and under what circumstances a

municipality can be held liable under § 1983 for enforcing a state law,[12] but it is

unnecessary for us to delve too deeply into that inquiry because, given the Court's final

decision here to enjoin the challenged portions of SEA 590 set forth above, we hold that

Plaintiffs' claim against the City based on its potential enforcement of Sections 18 and 20

is no longer ripe.

  In their briefing in opposition to the City's motion for summary judgment,

Plaintiffs argue that the question of ripeness was already addressed in our prior entry

---

[12] In *N.N. ex rel. S.S. v. Madison Metropolitan School District*, 670 F. Supp. 2d 927 (W.D. Wis. 2009), for example, the court, in addressing the relevant caselaw both in our circuit and our sister circuits, observed that "circuit courts have come to varying conclusions on the questions whether and to what extent municipalities may be held liable under § 1983 for following state laws" and that "the Supreme Court has yet to discuss [*Monell*'s] application in the context [of] a municipality's enforcement of a state law.  In this vacuum, lower courts have come to their own unique conclusions."  *Id.* at 933-34.

preliminarily enjoining the challenged sections of SEA 590 and thus need not be revisited now.  However, "[l]ike mootness, but unlike standing, ripeness is reevaluated throughout the course of litigation."  *Milwaukee Police Ass'n v. Board of Fire & Police Comm'rs of the City of Milwaukee*, 708 F.3d 921, 933 (7th Cir. 2013) (citing *Anderson v. Green*, 513 U.S. 557, 559 (1995) (per curiam) (when evaluating ripeness "it is the situation now rather than the situation at the time of the decision under review that must govern") (internal brackets and quotations omitted)).  "Ripeness concerns may arise when a case involves uncertain or contingent events that may not occur as anticipated, or not occur at all."  *Wisconsin Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011) (citations omitted).   In determining whether a claim is ripe for adjudication, courts consider "'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'"  *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S.190, 201 (1983) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

It is clear that Plaintiffs' claim is based, not on any direct action taken by the City, but on the assumption that if and when the challenged sections of SEA 590 became effective the City would enforce those provisions.  At the time we originally addressed the question of ripeness, SEA 590 was about to go into effect and the City had not affirmatively stated that it intended to refrain from enforcing Sections 18 and 20 if they became effective.  Accordingly, we found that there was a credible threat of enforcement sufficient to meet the second prong of the ripeness inquiry, to wit, that Plaintiffs would

suffer hardship if the court withheld consideration of their claim. However, the posture of the case has changed and with the Court's final determination on the merits, including a permanent injunction prohibiting enforcement of the challenged portions of SEA 590. Given our ruling, and the Supreme Court's directive in *Los Angeles County, Cal. v. Humphries*, 131 S.Ct. 447 (2010), in which the High Court made clear that civil rights plaintiffs must meet the standard set forth in *Monell* in order to successfully sue a municipality under § 1983 irrespective of whether the remedy sought is money damages or prospective relief, we conclude that Plaintiffs' claim against the City is contingent on the outcome of a variety of intervening acts and scenarios not fully settled at this time. These uncertainties render the claims against the City premature, and no longer ripe for adjudication.

In short, even assuming Plaintiffs were able to show that the challenged provisions of SEA 590 provide the City sufficient discretion such that any decision it might make to enforce those provisions could be said to be a *Monell* policy and not merely an action taken under the command of state law,[13] the City's opportunity to make such a decisioin

---

[13] It is clear under Seventh Circuit law that a municipality "cannot be held liable under section 1983 for acts that it did under the *command* of state or federal law" because "[w]hen the municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury." *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998) (emphasis added). Thus, "the question under *Bethesda Lutheran* is whether the municipality enforcing a state law has enough discretion in implementation to make the municipality 'responsible' for any constitutional violation that occured." *N.N. ex rel. S.S. v. Madison Metro Sch. Dist.*, 670 F. Supp. 2d 927, 934 (W.D. Wis. 2009). Plaintiffs argue that the City clearly has discretion under Sections 18 and 20 of SEA 590 because, while these sections give local law enforcement officers the *power* to arrest or issue citations in certain

will be entirely foreclosed unless and until these statutes are upheld as constitutional and not preempted.  Accordingly, we find that Plaintiffs' claim against the City is not ripe for adjudication at this time because they face no hardship, immediate injury, or prejudice from the Court's withholding of a ruling on that claim.

## IV.    Conclusion

As explicated above, Plaintiffs' Motion for Summary Judgment is <u>GRANTED</u> against the State Defendants and the State Defendants are hereby <u>PERMANENTLY ENJOINED</u> from enforcing the following sections of Senate Enrolled Act 590: Section 18, to be codified as Indiana Code ' 34-28-8.2, and Section 20, which amends Indiana Code ' 35-33-1-1(1), by adding new sections (a)(11)-(a)(13).  The State Defendants are hereby further ordered to inform forthwith all the affected Indiana state governmental entities of this injunction.  Because we hold Plaintiffs' claims against the City based on its potential enforcement of Sections 18 and 20 to be unripe for full adjudication and

---

circumstances, they do not *mandate* that the City take such action.  However, while this specific issue has not been addressed in the Seventh Circuit, there is support in case law from outside our circuit for the proposition that the type of discretion required is not simply the discretion to choose to enforce or not enforce the state statute in an individual situation, but rather that the municipality must have the discretion to choose whether it will enforce the statute or portions of the statute at all.  *See Vives v. City of New York*, 524 F.3d 346, 354 (2d Cir. 2008) (recognizing that these types of discretion are different and finding that the plaintiff was required to show that the defendant city had the latter type of discretion).  However, we find no compelling reason to further address these issues in the context of this litigation.

decision at this time, those claims are <u>DISMISSED WITHOUT PREJUDICE</u>.[14]  A final

judgment shall enter accordingly.

     IT IS SO ORDERED.


Date: _____03/28/2013_____

                                                  _____
                                                  SARAH EVANS BARKER, JUDGE
                                                  United States District Court
                                                  Southern District of Indiana

---

[14] It follows that because these claims are unripe for full adjudication, the City's cross-motion for summary judgment is <u>DENIED AS MOOT</u> without prejudice to its refiling, if and when appropriate.

40

Distribution:


Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org


Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org


Andre I. Segura
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
asegura@aclu.org


Cecillia D. Wang
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
cwang@aclu.org


Katherine  Desormeau
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
kdesormeau@aclu.org


Lee  Gelernt
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
lgelernt@aclu.org


Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
ojadwat@aclu.org


Eric C. Bohnet
ATTORNEY AT LAW
ebohnet@gmail.com


Jillian Leigh Spotts
CITY OF INDIANAPOLIS, CORPORATION COUNSEL
jillian.spotts@indy.gov


Matthew J. Piers
HUGHES SOCOL PIERS RESNICK & DYM, LTD
mpiers@hsplegal.com

Jose J. Behar
HUGHES SOCOL PIERS RESNICK & DYM, LTD.
jbehar@hsplegal.com

Joshua  Karsh
HUGHES SOCOL PIERS RESNICK & DYM, LTD.
jkarsh@hsplegal.com

Garrett R. Roe
IMMIGRATION REFORM LAW INSTITUTE
groe@irli.org

Adam  Clay
INDIANA ATTORNEY GENERAL
Adam.Clay@atg.in.gov

Jefferson S. Garn
INDIANA ATTORNEY GENERAL
jefferson.garn@atg.in.gov

Kenneth Lawson Joel
INDIANA ATTORNEY GENERAL
kenneth.joel@atg.in.gov

Betsy M. Isenberg
INDIANA OFFICE OF THE ATTORNEY GENERAL
Betsy.Isenberg@atg.in.gov

Micheal M. Hethmon
Immigration Reform Law Institute
25 Massachusetts Avenue NW, #335
Washington, DC 20001

Lynnette  Gray
JOHNSON GRAY& MACABEE
vhunter@embarqmail.com

Angela Denise Adams
LEWIS & KAPPES
aadams@lewis-kappes.com

Karen  Tumlin
NATIONAL IMMIGRATION LAW CENTER
tumlin@nilc.org

Karen  Tumlin
NATIONAL IMMIGRATION LAW CENTER
tumlin@nilc.org

Shiu-Ming  Cheer
NATIONAL IMMIGRATION LAW CENTER
cheer@nilc.org

Linton  Joaquin
National Immigration Law Center
joaquin@nilc.org

Linton  Joaquin
National Immigration Law Center
joaquin@nilc.org

Alexander Phillip Will
OFFICE OF CORPORATION COUNSEL
awill@indygov.org

Patricia Orloff Erdmann
OFFICE OF THE ATTORNEY GENERAL
Patricia.Erdmann@atg.in.gov

Clifford Lee Reeves, II
U.S. DEPARTMENT OF JUSTICE
lee.reeves@usdoj.gov

Jill Z. Julian
UNITED STATES ATTORNEY'S OFFICE
jill.julian@usdoj.gov

William W. Barrett
WILLIAMS HEWITT BARRETT & WILKOWSKI LLP
wbarrett@wbwlawyers.com